2021 IL App (1st) 182049

No. 1-18-2049

Second Division
March 30, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF ANDRE ADAMS, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 2011 CR 8000801 |
| v. | ) | |
| | ) | |
| Andre Adams, | ) | |
| | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | William G. Gamboney |
| | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent-Appellant, Andre Adams, appeals from his judgment of commitment as a

"sexually violent person" (SVP) under the Sexually Violent Persons Commitment Act (Act) (725

ILCS 207/1 *et seq.* (West 2010)). On appeal, respondent argues that this court should reverse the

judgment because (1) pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), a hearing

was required to establish that respondent's diagnosis was valid and generally accepted in the

scientific community and (2) there was insufficient evidence to prove beyond a reasonable doubt that respondent is an SVP. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     In 2005, respondent was convicted of criminal sexual assault. Later in 2011, prior to respondent becoming eligible for mandatory supervised release, the State sought to have the respondent committed as an SVP under the Act. The trial court determined that there was probable cause to believe that respondent was an SVP, and the matter proceeded to a jury trial on May 8, 2018.

¶ 4                                  A. Motion *in Limine*

¶ 5     Prior to trial, respondent filed a motion *in limine* requesting the court to bar the State's experts from testifying as to his diagnosis of a paraphilia. Relying on *In re Detention of New*, 2013 IL App (1st) 111556, respondent argued that the diagnosis of paraphilia by the State's experts was, in essence, a diagnosis of hebephilia that required a *Frye* hearing because it was not generally accepted within the scientific community. The trial court denied the motion. Citing to our supreme court's subsequent decision in *In re Detention of New*, 2014 IL 116306, the trial court found that a *Frye* hearing was not required because respondent was not diagnosed with hebephilia but was instead diagnosed with "other specified paraphilic disorder, nonconsenting males, non-specific type," which was generally accepted in the scientific community.[1] Respondent filed a motion for reconsideration, which the court denied. The case then proceeded to jury trial.

---

[1]Prior to the hearing on respondent's motion and after the publication of the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 (2013)), the State filed an amended petition to reflect the experts' update of respondent's diagnosis from paraphilia not otherwise specified to other specified paraphilic disorder nonconsent.

¶ 6                                   B. Jury Trial

¶ 7     Three expert witnesses testified at trial: Dr. Alison Schechter and Dr. Richard Travis for the State and Dr. Romita Sillitti for respondent. Respondent elected not to testify. All three experts considered respondent's criminal history, Department of Corrections (DOC) disciplinary records, and treatment at the Department of Human Services' (DHS) treatment and detention facility (TDF). Dr. Schechter, Dr. Travis, and Dr. Sillitti conducted clinical interviews of respondent in March 2011, September 2011, and January 2012, respectively.

¶ 8                     1. Respondent's Criminal and Disciplinary History

¶ 9     In 1993, two boys who were 15-years-old, reported to police that respondent, then 23 years old, performed oral sex on them. Respondent was charged with two counts of criminal sexual abuse, which were ultimately dismissed.

¶ 10    In 1994, respondent, then 25 years old, was charged with two counts of child abduction. During that incident, he approached two boys, ages 13 and 15, and convinced them to come to his house under the guise of recruiting them for a basketball team he coached. At his house, respondent approached the boys individually and offered them money in return for allowing him to perform oral sex on them. One of the boys initially agreed but then hesitated when respondent asked if he was still willing. The boy said he had to leave, and respondent let him go. Respondent then asked the other boy who also refused. Respondent pled guilty to two counts of child abduction and was sentenced to a year in prison.

¶ 11    The experts also considered respondent's charge of indecent solicitation in the years 1999-2000. Respondent was 30 years old at that time, and the victims were three 16-year-old males who knew him as a basketball coach. On several occasions between December 1999 and February 2000, respondent had the victims over to his house, where he offered them money to masturbate for him

and to allow him to perform oral sex on them. The victims refused and left the premises. Respondent pled guilty to indecent solicitation and was sentenced to 3 years in prison.

¶ 12    Respondent's most recent arrest for sexual misconduct was in 2002, which was designated by the experts as the index or predicate offense. Respondent, then 33 years old, approached a 14-year-old male victim on the street and told him that he was recruiting for a basketball team. Respondent and the victim then went to respondent's home, where respondent gave him six shots of gin, rendering him intoxicated. Respondent encouraged the victim to expose his penis, which respondent briefly touched. Respondent left the room and the victim fell asleep, but the victim later awoke to find his pants removed and respondent inserting his penis into the victim's rectum. The victim repeatedly told respondent to stop, but respondent continued. Respondent also performed oral sex and had the victim perform oral and anal sex acts on him. Respondent was charged with numerous counts of criminal sexual assault and sexual abuse. He pled guilty to one count of criminal sexual assault and was sentenced to 10 years in the DOC.

¶ 13    The experts also considered respondent's 1994 conviction for unlawful use of a firearm and a 1997 conviction for possession of a controlled substance, as well as his disciplinary history while he was incarcerated. For instance, in 2001, respondent was disciplined by the DOC for touching another inmate's penis without consent and, in 2008, when respondent made sexual comments to another inmate.

¶ 14                                    2. State's Expert Witnesses

¶ 15    Dr. Schechter is a clinical and forensic psychologist, licensed to evaluate and treat sex offenders. She had completed about 62 pretrial SVP evaluations and two posttrial SVP evaluations throughout her career. In March 2011, she evaluated respondent at the Western Illinois Correctional Center. The evaluation process consisted of a clinical interview, a risk assessment,

"formulating an opinion and then writing a report." The purpose of the clinical interview was to obtain information about the offender's background and his "sexual offending history," as well as "get a sense of the offender's thoughts, attitudes, and beliefs." After completing her evaluation, Dr. Schechter concluded that respondent was an SVP. She diagnosed him with "paraphilia not otherwise specified nonconsenting persons" and "personality disorder not otherwise specified with antisocial features."

¶ 16     Later in July 2014, she updated respondent's diagnosis to conform with the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), which had been published in 2013. She explained that the DSM-5 was "a standard authoritative reference manual used by mental health professionals that outlines and describes the various mental disorders." She found that respondent "continued to meet [the] criteria" for an SVP and diagnosed respondent with "other specified paraphilic disorder nonconsenting males in a controlled environment" and "other specified personality disorder with antisocial features." Dr. Schechter noted that it was acceptable practice in the psychology field to update evaluations.

¶ 17     In April 2017, Dr. Schechter issued a new report. She noted that at the time of her initial evaluation, she only had records of respondent's time at the DOC. However, at the time of her 2017 evaluation, she had additional records from TDF that "helped to clarify [respondent's] diagnosis." She diagnosed respondent with "other specified paraphilic disorder nonconsenting males nonexclusive type in a controlled environment" (OSPD nonconsent) and "narcissistic personality disorder." The "nonexclusive" specifier indicates that respondent is not exclusively attracted to "nonconsenting adolescent males." The "specifier in a controlled environment" applies to "individuals who are living in an institutional setting where opportunit[ies] to engage in sexual activity with a nonconsenting victim are restricted."

¶ 18   Dr. Schechter stated that the term "paraphilia denotes any intent and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with penis with physically mature consenting human partners." According to Schechter, a paraphilia constitutes a disorder when it causes distress for the individual or harm to others. The "category other specified paraphilic disorder," on the other hand, applies where "symptoms that are characteristic of a paraphilic disorder *** predominate but do not meet the specific criteria for any of the eight disorders that are specifically listed in the paraphilic disorder diagnostic class." Additionally, the symptoms last for a period of at least six months.

¶ 19   Dr. Schechter testified that respondent met the diagnostic criteria for OSPD nonconsent because his conduct showed an interest in "sexual activity with adolescent males who are unwilling to engage in sexual activity with him." Additionally, respondent satisfied this interest in a way that harmed others or caused a risk of harm to others. Dr. Schechter opined that the sexual interest was recurrent and intense because (1) respondent had been repeatedly incarcerated for sexually assaulting or attempting to have sex with nonconsenting adolescent males, (2) he showed a clear escalation of offending conduct, (3) repeatedly violated a position of trust as a basketball coach, and (4) sought out sex with nonconsenting victims even when consensual sexual activity was available to him. She further noted that, during treatment, respondent admitted numerous other uncharged sexual offenses and "repeatedly reported having fantasies of having complete power and control over victims," as well as fantasies about anal sex with young boys. Dr. Schechter also diagnosed respondent with "narcissistic personality disorder with antisocial traits," which entails "a persuasive pattern of grandiosity, need for admiration, and lack of empathy." She opined that a personality disorder has the effect of "exacerbat[ing] the paraphilic disorder or mak[ing] it worse" and "makes it much more likely that [respondent] would engage in reckless, criminal, and

interpersonally exploitative relationship towards others." She testified that respondent's disorders were not likely to resolve on their own and the disorders were "congenital or acquired condition that affects [respondent's] emotional or volitional capacity and *** predisposes him to engage in future acts of sexual violence." She explained "emotional or volitional capacity" means that it "affect[s] the way [respondent] thinks, feels, behaves, or makes choices to behave" and "makes it seriously difficult for him to control his behavior."

¶ 20    Dr. Schechter also conducted a risk assessment to "determine whether it was substantially probable that [r]espondent would commit an act of sexual violence." She conducted this assessment by using "actuarial instruments," such as the STATIC-99R and STATIC-2002R.[2] Respondent received a score of 8 on the STATIC-99R, which placed him in the well-above average risk category. Respondent received a score of 7 on the STATIC-2002R, which also placed him in the well-above average risk category. Dr. Schechter also utilized the Hare Psychopathy Checklist-Revised (PCL-R), a personality assessment instrument used to identify traits of psychopathy. Respondent received a score of 24, which placed him in the fifty-seventh percentile rank. Dr. Schechter also considered the "dynamic risk factors, protective factors, and [applicable] case specific factors." She concluded that respondent was "more likely than not" or "substantially probable [that respondent would] commit future acts of sexual violence."

¶ 21    On cross-examination, Dr. Schechter testified that she was aware that a penile plethysmograph (PPG) was performed on respondent at the TDF. A PPG test is used to measure physical arousal to a variety of sexually explicit images. Respondent was presented with images

---

[2]According to Dr. Schechter, STATIC-99-R and STATIC-2002R are "two of the most widely used actuarial instruments [*i.e.*, empirically derived tools] used to aid in the assessment of risk of sex offenders."

depicting both adults and adolescents in coercive and noncoercive settings. Respondent did not show a significant arousal response to the images. Dr. Schechter was also questioned about hebephilia, which she described as sexual attraction to "post adolescent individuals." She noted that hebephilia was proposed for inclusion in the DSM-5 but was ultimately not included. Dr. Schechter explained that OSPD nonconsent is used for paraphilias that are not specified in the DSM-5 and there were perhaps over 100 for the DSM-5 to list. She agreed that any of these unlisted paraphilias could support a diagnosis of OSPD nonconsent, provided there was evidence that it exists and impacts important areas of a person's functioning for at least 6 months. Dr. Schechter also acknowledged that some clinicians oppose the use of OSPD nonconsent as a basis of commitment, fearing that it may lead to the act of rape being classified as a mental disorder. She also acknowledged that there is no consensus in the mental health field regarding what constitutes impaired volitional or emotional capacity.

¶ 22    On redirect examination, Dr. Schechter clarified that she did not diagnose respondent with hebephilia but with OSPD nonconsent. She testified that they are "two separate diagnoses," explaining that "[h]ebephilia is essentially an attraction and sexual acting out with simply post adolescent individuals," whereas OSPD nonconsent deals with the "arousal to the nonconsensual aspect of the sexual activity."

¶ 23    Dr. Travis is a clinical psychologist. Since March 2011, he worked for DHS as an SVP evaluator and had conducted over 500 SVP evaluations. In September 2011, he was assigned to evaluate respondent and concluded that respondent qualified as an SVP. In 2014, he updated his evaluation to conform with DSM-5, which had been published. His opinion that respondent met the SVP criteria did not change. Based on DSM-5, Dr. Travis diagnosed respondent with OSPD nonconsent, stating that the "specification on that was that he is sexually attracted to nonconsenting

persons." He also diagnosed respondent with narcissistic personality disorder. Dr. Travis evaluated respondent for a third time in 2016, taking into account additional treatment records from the TDF.

¶ 24    Dr. Travis explained that OSPD nonconsent requires a person to have urges or fantasies about having full power or control over sexual partners or about making sexual partners do things they may not want to do. He testified that the person must experience distress or cause harm to others and must engage in nonconsensual sexual acts. In the present case, Dr. Travis opined that respondent experienced sexual distress which stemmed from "wanting to have [sex] with minor males and because of his religion" and the perceived conflict between his bisexuality and religion. Dr. Travis also noted that respondent has caused harm to others, citing to respondent's admissions during treatment that he has sexually offended up to 31 people. Dr. Travis testified that one of the usual elements of sexual offending is hypersexuality, which was exhibited here. Dr. Travis noted that during treatment, respondent admitted that he regularly masturbated to thoughts of anal sex with minor males, fantasized about having power and control over other people, and offended only against people he was sure would remain silent. Dr. Travis testified that people with OSPD nonconsent gain control of their victims in different ways, such as through intoxication, intimidation, or threats.

¶ 25    Dr. Travis further testified that he could diagnose respondent with OSPD nonconsent even though he had not offended since 2002 because such a disorder was unlikely to go away without treatment. He stated that respondent's mental disorders were "congenital or acquired conditions" and they "impact his emotional or volitional capacity," making him "more likely to follow his impulse and urges." Dr. Travis noted that respondent was 33 at the time of his last offense and that a person's sexual interests do not change much after their mid-20s. Additionally, respondent had a long pattern of sexual offenses, and respondent himself had said that he did not expect his sexual

interests to go away. Like Dr. Schechter, Dr. Tavis also performed a risk assessment using the actuarial instruments. The results were the same. Dr. Travis also discussed the results of respondent's PPG test. He stated that that results did not "mean anything because [respondent was] obviously sexually attracted to something." He concluded that respondent's risk of sexual reoffending was "substantially probable."

¶ 26    On cross-examination, Dr. Travis was questioned about hebephilia. Dr. Travis described it as an attraction to "pubescent children" or people in the approximate age range of 11 to 14. He acknowledged that having a paraphilia or being a serial rapist does not necessarily mean that one's emotional or volitional capacity is impaired.

¶ 27                              3. Respondent's Expert Witness

¶ 28    Respondent's expert, Dr. Sillitti, first evaluated respondent in January 2012 after the trial court found probable cause that respondent was an SVP. She diagnosed respondent with narcissistic personality disorder with antisocial traits. Dr. Sillitti later reevaluated respondent in 2017 to account for new TDF records and the publication of DSM-5. During the interview, respondent revealed the sexual abuse and domestic violence he experienced as a child. Respondent also told Dr. Sillitti that he had about 100 sexual partners and sexual contact with at least 22 adolescents. Dr. Sillitti's diagnosis of respondent did not change.

¶ 29    Dr. Sillitti opined that respondent's need to feel important explained his attraction to adolescents, who would not challenge his authority as adults would. She opined that although respondent's narcissistic personality disorder contributed to his sexual offenses, it did not impair his emotional and volitional capacity. Dr. Sillitti discussed hebephilia, which she defined as an "attraction to adolescents." She testified that there was a movement to include hebephilia in the

DSM-5, but it was not included in part because research had shown that attraction to adolescents was not uncommon. Thus, she did not consider respondent's attraction to adolescents abnormal.

¶ 30     Dr. Sillitti testified that although OSPD nonconsent is not specifically defined in the DSM-5, people with that disorder "would generally be specifically aroused by the act of forcing somebody to have sex." She did not diagnose respondent with OSPD nonconsent because respondent did not physically force his victims when they refused to have sex with him, with exception of the index offense where respondent continued the sexual acts despite the victim's protests. With respect to the index offense, Dr. Sillitti testified that respondent admitted that he committed the offense because he "lost all control." However, respondent also admitted that he maintained the ability to stop. She further testified that the PPG did not inform her opinion about respondent's sexual interests because he did not show any arousal response, even to subjects in which he admitted having sexual interest.

¶ 31     In assessing respondent's risk of sexually offending, Dr. Sillitti used the Static-99R. She found that respondent was at risk of reoffending, but "it's not due to a mental disorder that he can't control." As such, she concluded that respondent did not satisfy the statutory criteria for commitment as an SVP.

¶ 32     On cross-examination, Dr. Silliti testified that she worked full-time with Cermak Health Services and SVP evaluations were not part of her work. However, she conducted SVP evaluations in the past, and her last evaluation was in 2016. Dr. Silliti acknowledged that respondent reported that he "lost control" during the index offense. During treatment, respondent started having fantasies of having full power and control over sexual partners and doing whatever he wants to them. She acknowledged that respondent was at high risk to reoffend.

¶ 33    On redirect, Dr. Silliti noted that the mental disorder would need to "affect *** emotional and volitional capacity which could predispose [an individual] to engage in acts of sexual violence." She testified that although respondent was at risk of reoffending, it was not due to a mental disorder that he could not control.

¶ 34                    C. Verdict and Trial Court Decision

¶ 35    After the close of evidence, the jury returned a verdict finding respondent to be an SVP. The trial court found that respondent was at well-above average risk to reoffend. Given his level of treatment progress at that time, the court found that the TDF was the least restrictive environment where respondent could be treated and monitored. As such, the court ordered respondent be committed to the DHS for treatment and institutional care.

¶ 36                            II. ANALYSIS

¶ 37    On appeal, respondent argues that the trial court erred in denying his motion *in limine* to bar the State's expert witnesses from testifying about his diagnosis without a *Frye* hearing. Respondent contends that the essence of the State's experts' opinions was that he was attracted to adolescent males and, as such, he was diagnosed with hebephilia, which required a *Frye* hearing. Respondent further argues that there is insufficient evidence that his mental disorder makes it "much more likely than not that he will engage in future acts of sexual violence." The State, on the other hand, contends that a *Frye* hearing was not necessary because respondent was diagnosed with OSPD nonconsent, a generally accepted mental disorder. The State also argues that there was sufficient evidence to prove that the respondent was an SVP. We agree with the State.

¶ 38                    A. Motion in *Limine* and *Frye*

¶ 39 Respondent contends that his conduct, as described by the State's experts, was equivalent to a diagnosis for hebephilia. He argues that, notwithstanding the State's experts' avoidance in

identifying his attraction to adolescents, the evidence shows that, with the exception of a single encounter with an adult male, his advances were to adolescent males. Because his conduct fits within the definition of hebephilia, which, pursuant to *New*, has not been accepted in the psychiatric community, respondent contends that a *Frye* hearing was required. Thus, he maintains, the trial court's decision to deny his motion *in limine* to bar the State's experts' testimony absent a hearing, was reversible error.

¶ 40 Admission of scientific evidence is governed by the *Frye* standard. *In re Commitment of Simons*, 213 Ill. 2d 523, 529 (2004). This standard is codified by the Illinois Rules of Evidence, which provides that

"[w]here an expert witness testifies to an opinion based on a new or novel scientific methodology or principle, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

"The purpose of the *Frye* test is to exclude new or novel scientific evidence that undeservedly creates 'a perception of certainty when the basis for the evidence or opinion is actually invalid.' " *New*, 2014 IL 116306, ¶ 26 (quoting *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78 (2002), *abrogated on other grounds by In re Commission of Simons*, 213 Ill. 2d 523, 529 (2004)). "Imposition of the test serves to prevent the jury from simply adopting the judgment of an expert because of the natural inclination of the jury to equate science with truth and, therefore, accord undue significance to any evidence labeled scientific." *Id.* We review a trial court's ruling on a motion *in limine* based on the denial of a *Frye* hearing *de novo*. *Simons*, 213 Ill. 2d at 531.

¶ 41    The crux of respondent's argument on appeal is that the State's experts essentially diagnosed him with hebephilia. In an attempt to fit within the four corners of *New*, 2014 IL 116306, respondent urges that notwithstanding the State's label of OSPD nonconsent, his conduct was actually the same as the conduct described in *New*, which supported a diagnosis of hebephilia. He points out that, like with hebephilia, he was largely attracted to adolescent males. Other than the one reported incident involving an adult male, his advances were made to underage males. Thus, he contends that, consistent with *New*, he was entitled to a *Frye* hearing. We reject this argument.

¶ 42    In *New*, the issue before our supreme court was "whether paraphilia NOS, sexual attraction to early adolescent males, otherwise known as hebephilia, is a diagnosable mental condition based upon legitimate scientific principles and methods." *New*, 2014 IL 116306, ¶ 33. The supreme court found that it had "an inadequate basis to determine whether this diagnosis has gained general acceptance in the psychological and psychiatric communities." *Id.* ¶ 53. Therefore, the court held that the hebephilia diagnosis was subject to a *Frye* hearing to determine if it was "a generally accepted diagnosis in the psychiatric and psychological communities." *Id.*[3]

¶ 43    Respondent's argument overlooks the testimony of the State's experts in which they both indicated that the basis of their diagnosis was respondent's attraction to individuals over whom he could assert power. The diagnosis in *New* was paraphilia not otherwise specified (PNOS) "sexually attracted to adolescent males," and one of the experts admitted that it was "essentially the same" as the hebephilia diagnosis proposed for inclusion in the DSM-5. Here, Dr. Schechter and Dr. Travis specifically stated that they did not diagnose respondent with hebephilia but with OSPD

---

[3]We note that subsequent to our supreme court's decision in *New*, the Second District Appellate Court decided *In re Commitment of Bauer*, 2020 IL App (2d) 180905, in which it affirmed the trial court's post-*Frye* hearing determination that hebephilia has been generally accepted in the psychiatric and psychological communities.

nonconsent. As Dr. Schechter explained, they are "two separate diagnoses" because "[h]ebephilia is essentially an attraction and sexual acting out with simply post adolescent individuals" whereas OSPD nonconsent deals with the "arousal to the nonconsensual aspect of the sexual activity." Although Dr. Schechter and Dr. Travis considered respondent's criminal history, which mainly involved victims who were minors, the experts considered the victims' nonconsent as a basis for respondent's commitment. For instance, Dr. Travis testified that he diagnosed respondent with OSPD nonconsent because "he is sexually attracted to nonconsenting persons." Dr. Schechter also testified that respondent met the diagnostic criteria for OSPD nonconsent because his conduct showed an interest in "sexual activity with adolescent males who are unwilling to engage in sexual activity with him." Additionally, the experts considered a disciplinary action against respondent, which involved him touching an adult inmate without consent. The index offense also involved a clear instance of nonconsent.

¶ 44    Dr. Travis further explained that OSPD nonconsent requires a person to have urges or fantasies about having full power or control over sexual partners or about making sexual partners do things they may not want to do. He noted that during treatment, respondent admitted that he fantasized about having power and control over other people and offended people he was sure would remain silent. As such, the court's ruling in *New* has no bearing on the present case because respondent here was not diagnosed with hebephilia or a mental disorder based on attraction to adolescents but, rather, the experts' diagnosis was based on the nonconsensual aspect of respondent's actions.

¶ 45    Respondent nonetheless maintains that here, like in *New*, the respondent was not specifically diagnosed with hebephilia. He notes, and we agree, that *New* requires that the substance or content of the diagnosis be tested under *Frye*. Initially we note that the respondent's

conduct, as described in *New*, was in fact determined to fit within the diagnosis of hebephilia, *i.e.*, attraction to adolescent males. The fact that a greater number of respondent's sexual offenses involved adolescent males served as only one factor in the State's experts' diagnosis. Respondent does not dispute that there were encounters with nonconsenting males. We would additionally point out that respondent's expert, Dr. Sillitti, testified that respondent told her that he had "about 100 sexual partners and sexual contact with at least 22 adolescents." This fact is consistent with the State's experts' "nonexclusive" specifier, a specifier not attributed to the respondent in *New*. Moreover, unlike the diagnosis in *New*, here the State's experts explained that the "nonconsent" specifier in respondent's diagnosis indicates arousal to the nonconsensual aspect of the sexual activity. Not to be overlooked, Dr. Sillitti testified that people with OSPD nonconsent would generally be specifically aroused by the act of forcing another to engage in sexual activity. She conceded that respondent had fantasies about having full power and control over his sexual partners. Although Dr. Sillitti found insufficient evidence upon which to diagnose respondent with OSPD nonconsent, she never actually diagnosed respondent with hebephilia. Further, Respondent's argument would have us discount the entire substance of the State's experts' testimony, parsing out only those aspects regarding his sexual encounters with adolescent males. This, it would seem, would go against the suggestion of *New* that we consider the substance and the content of the diagnosis.

¶ 46 Respondent argues that the "nonconsenting" specifier does not render the OSPD nonconsent diagnosis meaningfully different from hebephilia. In support, he points out that the State's experts testified that he is sexually attracted to consenting people and nonconsenting people, alike. Respondent maintains, however, that the "nonconsent" specifier is linked to his attraction to adolescent males who are too young to consent.

¶ 47    We note that Dr. Schechter's diagnosis did include "non-exclusive" as a specifier in her diagnosis. Thus, we agree that respondent was diagnosed as being sexually attracted to both consenting and nonconsenting individuals. However, we do not perceive the experts' inclusion of the "nonconsent" specifier as relating to the age of legal consent but, instead, in the context of the diagnosis, relating to individuals who demonstrate a lack of willingness to be engaged in sexual activity. Thus, respondent's argument brings him no closer to the facts in *New*.

¶ 48    Citing *In re Detention of Melcher*, 2013 IL App (1st) 123085, *In re Detention of Hayes*, 2014 IL App (1st) 120364 (*Hayes I*), and *McGee v. Bartow*, 593 F.3d 556 (7th Cir. 2010), respondent next argues that the trial court failed to analyze the underlying issue of his diagnosis and relied instead on prior judicial decisions to establish OSPD's general acceptance. He offers that neither *Melcher*, *Hayes I*, nor *McGee* were acceptable to our supreme court as a basis to take judicial notice that the hebephilia diagnosis in *New* was generally accepted. Accordingly, respondent argues that we may not rely upon them here.

¶ 49    Respondent could perhaps prevail had he, like the respondent in *New*, been diagnosed with hebephilia. In any case, respondent correctly notes that it is generally established that a court may determine general acceptance in two ways: (1) based on a *Frye* hearing or (2) judicial notice of prior judicial decisions. See *People v. McKown*, 226 Ill. 2d 245, 254 (2007). In *New*, the State offered *Melcher*, *Hayes I*, and *McGee* as decisional law of which the court could take judicial notice of the general acceptability of the hebephilia diagnosis. The court distinguished those cases from the one then at bar, noting that each addressed a PNOS diagnosis different from hebephilia. Thus, the court rejected those cases as relevant.

¶ 50    As we have rejected respondent's argument that his conduct and diagnosis is synonymous with the respondent's described conduct and diagnosis in *New*, we find his argument to be wholly

lacking in merit. Thus, although *Melcher*, *Hayes I*, and *McGee* could not serve as judicial decisions of which judicial notice of general acceptance of PNOS, sexually attracted to adolescent males (hebephilia), could be taken, the same may not be said of their utility in evaluating respondent's diagnosis of OSPD nonconsent here. In that regard, we find *Hayes I* and *In re Detention of Hayes*, 2015 IL App (1st) 142424 (*Hayes II*), particularly instructive.

¶ 51    In *Hayes I*, the respondent had been determined to be an SVP under the Act. On appeal, this court affirmed the respondent's commitment, finding that PNOS, attracted to nonconsenting adolescents and adults (PNOS nonconsent), was generally accepted as a valid diagnosis. *Hayes I*, 2014 IL App (1st) 120364. The court noted that the respondent's diagnosis, PNOS, for which he was initially committed, was included in the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, DSM-IV-TR (2000)). *Hayes I*, 2014 IL App (1st) 120364, ¶ 35.

¶ 52    Twelve months following the respondent's initial commitment, he was reevaluated and determined to continue to be an SVP requiring commitment. [4] *Hayes II*, 2015 IL App (1st) 142424, ¶¶ 6-7. On the State's motion, the trial court denied the respondent's request for a probable cause hearing on his status as a sexually violent person. *Id.* ¶ 7. The respondent appealed, seeking reversal of the court's denial. The basis of his argument on appeal was a purported change of the disorder's criteria, as defined in DSM-5, which had then been published. *Id.* ¶ 12

---

[4]Pursuant to the Act, a committed respondent must be evaluated at least once every 12 months after an initial commitment to determine whether there has been any progress in treatment and whether the person's conduct has changed. *Hayes II*, 2015 IL App (1st) 142424, ¶ 6.

¶ 53    In affirming the trial court's denial of a probable cause hearing, we held that the change from PNOS, the respondent's initial diagnosis as reflected in DSM-IV-TR, to other specified paraphilic disorder (OSPD), the renaming of the respondent's initial diagnosis, as reflected in DSM-5, did not suggest a change in professional knowledge. *Id*. ¶ 23. Rather, the change was no more than a relabeling or clarification of the elements of essentially the same disorder. *Id*. Citing *Melcher* and *McGee*, we further held that PNOS nonconsent had been held to be an appropriate diagnosis in this state and elsewhere. *Id.* ¶ 25. Thus, DSM-5's change from PNOS to OSPD did not serve as a basis for a probable cause hearing on his status. *Id.*

¶ 54    Significantly, in *Melcher*, we held that it was appropriate to take judicial notice that PNOS nonconsent, is generally accepted within the psychological community. *Melcher*, 2013 IL App (1st) 123085, ¶ 58; see also *Brown v. Watters*, 599 F.3d 602, 610 (7th Cir. 2010) (rejecting challenge to paraphilia NOS diagnosis as lacking scientific validity). Earlier, in *In re Detention of Lieberman*, 2011 IL App (1st) 090796, we noted that the diagnosis of paraphilia NOS, nonconsent has been the basis for numerous probable cause or SVP findings in this state and in jurisdictions outside of this state. *Id*. ¶ 53 (citing cases).

¶ 55    Finally, respondent argues that even if the State's experts' diagnosis applies, and we hasten to add that it does, there is no evidence that the diagnosis is generally accepted, and the trial court was not asked to take judicial notice of any decisions or scientific support. Further, he argues, even if there are such cases, reliance upon them would be inappropriate "if the underlying issue of scientific acceptance has not been adequately litigated."

¶ 56    We believe that *Melcher*, and its progeny, support the conclusion that OSPD, formerly labeled PNOS, is generally accepted in the psychological and psychiatric communities. Accordingly, respondent's argument that there are no published cases to demonstrate that OSPD

nonconsent has been subject to *Frye* necessarily fails. Further, respondent points to nothing to support his suggestion that litigation of general acceptance of the diagnosis may not been adequate. Thus, we take judicial notice of *Melcher* and reaffirm our holding in *Hayes II*, as it relates to the general acceptability of OSPD nonconsent. Given the general acceptance of PNOS nonconsent and its equivalent OSPD, we find that a *Frye* hearing was not necessary.

¶ 57                              B. Sufficiency of the Evidence

¶ 58    Respondent next contends that the evidence was insufficient to prove beyond a reasonable doubt that he is an SVP. In reviewing a challenge to the sufficiency of the evidence, "we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of Fields*, 2014 IL 115542, ¶ 19. It is not the function of this court to retry the defendant. *People v. Smith*, 177 Ill. 2d 53, 73 (1997). Rather, the trier of fact is charged with evaluating the credibility of the witnesses, resolving conflicts in the evidence, and deciding what reasonable inferences to draw from the evidence. *People v. Daniel*, 311 Ill. App. 3d 276, 282 (2000).

¶ 59     To establish that respondent is an SVP, the State must prove beyond a reasonable doubt that (1) respondent was convicted of a sexually violent offense, (2) he has a mental disorder, and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence. 725 ILCS 207/5(f) (West 2010). Under the Act, a mental disorder is defined as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b).

¶ 60    Here, respondent concedes that the first and second elements have been satisfied. However, respondent argues that the State failed to prove the third element, that his mental disorder made it substantially probable that he would engage in future acts of sexual violence. We disagree. Both

Dr. Schechter and Dr. Travis testified that respondent's disorders are congenital or acquired condition and affect his emotional or volitional capacity. Dr. Travis noted that this makes him "more likely to follow his impulse and urges." The experts also used several recognized assessments to predict respondent's likelihood of reoffending. Based on their interviews with respondent, his history of sexual violence, and the results of the risk assessments, both Dr. Schechter and Dr. Travis opined that respondent's emotional or volitional capacity predisposed him to commit acts of sexual violence. They concluded that a substantial probability existed that respondent would commit another sexually violent crime in the future. Additionally, respondent himself had stated that he did not expect his sexual interests to go away in the future.

¶ 61 Although respondent's expert, Dr. Sillitti, did not agree with the conclusion drawn by the State's experts, we will not disturb the findings of the trier of fact, which is in the best position to weigh the testimony of the experts and assess their credibility. On review, the issue before us is whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could find that the elements of the offense have been proved beyond a reasonable doubt. In the present case, two experts testified consistently that respondent has a mental disorder that makes it substantially probable that he will commit sexually violent acts in the future. Both relied on psychological testing, the record, police reports, evaluations, and interviews with respondent in reaching their conclusion. As such, there was sufficient evidence to prove respondent was an SVP and a rational trier of fact could have found that all the elements under the Act were proven.

¶ 62                                    III. CONCLUSION

¶ 63 For the reasons stated, we affirm the judgment of the circuit court.

¶ 64 Affirmed.

---

**No. 1-18-2049**

---

| | |
|---|---|
| **Cite as:** | *In re Commitment of Adams*, 2021 IL App (1st) 182049 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2011-CR-8000801; the Hon. William G. Gamboney, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Joseph G. Howard, of Law Offices of Joseph G. Howard, P.C., of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick, Joshua M. Schneider, and Aaron M. Williams, Assistant Attorneys General, of counsel), for the People. |

---