2025 IL App (1st) 230047-U

No. 1-23-0047

First Division
March 31, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| | ) | Appeal from the |
| *In re* COMMITMENT OF SEBRON FLOYD, | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | No. 02 CR 80002 |
|   v. | ) | |
| | ) | |
| Sebron Floyd, | ) | Honorable |
|     Respondent-Appellant). | ) | Tyria Walton |
| | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We affirm the judgment below where the trial court did not err in ruling that the State's petition to commit respondent under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2002)) was timely, that respondent's statutory and constitutional rights to a speedy trial were not violated, and that expert testimony was admissible under the *Frye* standard. The court also did not commit error in instructing the jury that the existence of a particular mental disorder was "generally accepted" in the scientific community, and the jury's verdict that respondent was a Sexually Violent Person was supported by sufficient evidence.

¶ 2    In June 1999, the State filed a petition to civilly commit respondent Sebron Floyd under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 1998)). The State voluntarily dismissed its petition prior to trial, but later filed a new SVP petition against respondent in March 2002. Following over two decades of litigation marked by extensive continuances, a jury found respondent to be an SVP after a trial in July 2022. Respondent now appeals, arguing that (1) the State's SVP petition was untimely, (2) the State violated both his statutory and constitutional rights to a speedy trial, (3) the trial court erred in applying the *Frye* standard to the admission of expert testimony, (4) the trial court improperly instructed the jury that a particular mental disorder was "generally accepted" in the psychological and psychiatric communities, and (5) the State failed to prove that he was an SVP beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                          A. Respondent's Criminal History

¶ 5    The record reveals the following relevant information on respondent's criminal history.

¶ 6    In 1988, when respondent was 17 years old[1], he was charged with aggravated criminal sexual assault for attacking a woman outside his apartment building. The woman, who also lived in the building, told police that respondent knocked her to the ground, covered her mouth with his hand, and threatened to kill her if she screamed. Respondent then stuck his hand inside her clothes, fondling her breasts and buttocks and digitally penetrating her vagina. The commotion alerted the

---

[1] Respondent's age was the subject of some controversy in the proceedings below, as various documents listed a number of different birth years. However, in July 2019, the trial court entered an order directing the Illinois Department of Human Services to modify its records to reflect that respondent was born on November 20, 1971. The record shows that this was the date ultimately considered by all expert witnesses in their respective testimonies.

woman's father, who came out of the apartment building and chased respondent away. Respondent initially denied any involvement, but later admitted that he assaulted the woman and "touched her vagina." However, the charges were dismissed after the victim moved overseas and was unable to testify.

¶ 7     In 1990, respondent approached a 24-year-old woman sitting in her car outside her apartment building, covered her mouth with his hand, and threatened to kill her if she screamed. Respondent, who was naked, then stated, "I want your p***y." The victim struggled and honked her car horn, which alerted her husband and caused respondent to flee. Respondent subsequently pled guilty to aggravated criminal sexual assault and was sentenced to three years in the Illinois Department of Corrections (IDOC).

¶ 8     In 1992, while on parole for the 1990 case, respondent and his friends broke into the apartment of a 67-year-old woman. Respondent later explained that they decided to rob the woman because she had been "causing [them] problems" by "calling the police on him and his friends." After his friends left the woman's apartment, respondent tied a sheet over her head, threatened her to remain silent, and raped her vaginally and anally. Respondent pled guilty to aggravated criminal sexual assault and was sentenced to 14 years in IDOC.

¶ 9     The record also reveals numerous nonsexual behavioral issues. For example, respondent was adjudicated delinquent at age 11 after attempting to stab his teacher with a pocketknife. At the same age, respondent broke another boy's legs with a baseball bat. As an adult, respondent was convicted of burglary, possession of stolen vehicle, and twice for aggravated battery after assaulting Department of Human Services (DHS) staff members while in custody. Respondent also had dozens of disciplinary infractions from his time in DHS custody for a variety of nonsexual reasons such as fighting and insubordination.

¶ 10                          B. The State's SVP Petitions

¶ 11    On June 24, 1999, three days before respondent was scheduled to enter mandatory supervised release (MSR) for his 1992 sexual assault conviction, the State filed a petition to commit respondent under the Act. However, respondent committed aggravated battery against a DHS staff member while in custody awaiting trial. He pled guilty to that offense on May 22, 2000, and was sentenced to 5 years in IDOC. That same day, respondent's MSR for the 1992 conviction was revoked.

¶ 12    On July 7, 2000, after the revocation of respondent's MSR, the trial court granted the State's motion to voluntarily dismiss its SVP petition. Respondent remained in IDOC custody serving his sentences for the 1992 sexual assault conviction and the new 2000 aggravated battery conviction. Respondent completed his sentence for the 1992 case on August 20, 2001.

¶ 13    On March 20, 2002, two days before respondent was set to enter MSR on the aggravated battery conviction, the State filed a new SVP petition. The petition alleged that two separate evaluators had diagnosed respondent with, among other mental disorders, other specified paraphilic disorder, sexually attracted to nonconsenting women (OSPD Nonconsent).[2]

¶ 14    On April 4, 2002, the trial court conducted a probable cause hearing and found probable cause for further SVP proceedings.

¶ 15                          C. Pretrial Litigation and Delays

¶ 16    The litigation that followed was marked by many years of delay for a variety of reasons, which we detail here to the extent necessary to resolve the issues raised on appeal.

_____

[2] OSPD was previously classified as paraphilia not otherwise specified (PNOS), which is the term appearing in the State's 2002 petition. *In re Commitment of Brown*, 2021 IL App (1st) 191606, ¶ 91 n.2. For the sake of consistency, we will use OSPD. *In re Commitment of Adams*, 2021 IL App (1st) 182049, ¶ 53.

¶ 17 After the probable cause hearing, the case was continued so that respondent could file a motion to dismiss. Respondent filed that motion on April 25, 2002, arguing that the State's petition was untimely because it was not filed within 30 days of the completion of his sentence for the 1992 sexual assault. The trial court denied the motion on May 3, 2002, reasoning that the petition was filed within 30 days of respondent entering MSR for the 2000 aggravated battery, which was served concurrently to his sentence for the 1992 conviction.

¶ 18 On June 3, 2002, the trial court granted respondent's request to certify for interlocutory appeal the question of whether his sentences were concurrent within the meaning of the Act. However, on August 12, 2002, respondent's counsel explained that the appeal was not docketed because he failed to file a timely application for leave to appeal. The case was continued by agreement so that respondent could gather the necessary materials and "ask the Court to recertify" the question. However, for reasons unclear from the record, respondent did not pursue the interlocutory appeal any further at that time.

¶ 19 On October 3, 2002, the case was continued by agreement for respondent to file a motion on the conditions of his confinement. Two weeks later, respondent filed an extremely brief motion asserting that he was being "illegally held" in segregation while in DHS custody. After three more continuances (two by agreement and one because respondent's counsel was not in court), the trial court denied the motion on November 25, 2002.

¶ 20 The case was continued by agreement to January 15, 2003 and then by agreement to March 12, 2003. Respondent's appearance was waived for both dates because he was litigating an unrelated case in federal court.[3] At the January 15 hearing, respondent's counsel stated that

_____

[3] Although the record does not contain many details, it appears the federal case was a *pro se* suit concerning medical care respondent was receiving in custody.

respondent "has been involved in federal investigations, so we haven't been really working on this because he's been involved in the federal case."

¶ 21    After several more continuances (all of which were by agreement except for one by order of court for unclear reasons), respondent filed a second motion to dismiss the SVP petition in November 2003. Respondent again argued that the SVP petition was untimely because his sentence for the 2000 aggravated battery was not concurrent to his sentence for the 1992 sexual assault. After four more continuances (two by agreement and two because an assistant attorney general was not in court), the trial court heard argument on respondent's motion to dismiss on February 19, 2004. The case was then continued to March 9, 2004 for respondent's counsel to conduct further research in support of his motion. The trial court heard additional argument on March 9 and denied respondent's motion.

¶ 22    At the conclusion of the March 9 hearing, the trial court judge, Judge Wood, held respondent in contempt of court for making a "[t]hreatening" remark to an assistant attorney general. Pursuant to the contempt order, respondent was transferred to the Cook County jail and then returned to DHS custody in May 2004.

¶ 23    On May 6, 2004, respondent filed a *pro se* motion to substitute Judge Wood for cause, which respondent's counsel later adopted. After several more continuances, the motion was heard by a different judge on October 19, 2004. Respondent's counsel argued that Judge Wood was no longer impartial, as he unfairly held respondent in contempt and was "not receptive to [respondent's] positions." Respondent's motion was denied, and the case was continued by agreement to November 4, 2004 before Judge Wood.

¶ 24    On November 4, 2004, the case was continued because respondent's counsel was not in court. The case was further continued by agreement to January 5, 2005 for status on discovery

before a new trial judge because Judge Wood retired. On that date, respondent's counsel acknowledged that they "haven't made much progress" because the contempt proceedings and motion to substitute judge "took the better part of last year." Counsel also admitted that he "frankly ha[d]n't looked at the file in quite some time" and needed time to procure an expert witness.

¶ 25 The case was then continued to March 5, 2005, on which date respondent requested additional time to prepare another motion to dismiss. Respondent filed that motion on April 26, 2005, arguing that the SVP petition was untimely because the State voluntarily dismissed its original petition and did not file a new petition within one year as required by section 13-217 of the Code of Civil Procedure (735 ILCS 5/13-217 (West 2004)). After five continuances (three by agreement, one because the assistant state's attorney was ill, and one because respondent's counsel was not prepared), the court heard arguments on the motion on August 10, 2005. The case was then continued by order of court for the parties to obtain relevant transcripts. After two more continuances by agreement, the trial court denied respondent's motion to dismiss on October 26, 2005.

¶ 26 On January 12, 2006, after three more continuances by agreement, respondent's counsel indicated that respondent was "interested in having some issues certified for appeal" regarding his motions to dismiss. Accordingly, the case was continued on respondent's motion to February 22, 2006, so that counsel could investigate the viability of an interlocutory appeal. On that date, however, respondent informed the court that he would not pursue an interlocutory appeal or ask the court to reconsider its rulings on the motions to dismiss.

¶ 27 The case was next continued 12 times while respondent searched for an expert witness. On May 16, 2007, the court appointed Dr. Eric Ostrov as respondent's expert. The case was continued

by agreement 10 more times while Dr. Ostrov evaluated respondent and prepared his report. [4] On August 20, 2008, respondent's counsel informed the court that Dr. Ostrov had completed his report but respondent did not intend to call him as a witness.

¶ 28    The case was continued by agreement to October 22, 2008, for respondent's counsel to investigate the viability of a *pro se* motion respondent wished to file. However, the motion was not filed at that time.

¶ 29    The case was next continued four more times (twice by agreement and twice because respondent's counsel was not in court) to February 24, 2009. On that date, the State informed the court that it had filed a motion for a new evaluation, as the doctor who previously evaluated respondent in January 2002 was no longer available to testify due to medical issues. After five more continuances, all of which were by agreement, respondent filed a response to the State's motion in May 2009. On June 24, 2009, respondent requested additional time to supplement his response with "some things *** that were not taken into account" in other cases where the State was allowed to replace the evaluator in question. On October 6, 2009, after two more continuances by agreement, the court granted the State's motion and appointed Dr. Jacqueline Buck to conduct a new evaluation.

¶ 30    At the conclusion of the October 6 hearing, the parties initially agreed to continue the case to December 1, 2009 while Dr. Buck completed her evaluation. However, respondent made a *pro se* objection to Dr. Buck's appointment on the grounds that he had previously filed for a "restrain[in]g order" against Dr. Buck in federal court "because of another incident that she pulled on [him.]" The case was then continued by agreement to October 19, 2009 for inquiry into

---

[4] During this period, the court also denied respondent's motion to attend his mother's funeral.

defendant's objection. The court maintained Dr. Buck's appointment on that date, noting that respondent's lawsuit against her had been dismissed and that no litigation remained pending.

¶ 31    The case was continued by agreement five times to May 24, 2010. At the May 24 hearing, respondent's counsel indicated that he had received Dr. Buck's report and intended to take her deposition. The case was once again continued by agreement.

¶ 32    On August 30, 2010, respondent informed the court that he wished to replace his counsel due to counsel's alleged failures to communicate with him, file motions on his behalf, and address various medical issues he was experiencing while in custody. Counsel sought leave to withdraw, which the court granted. The court also appointed new counsel to represent respondent, and the case was continued by agreement four more times for the new counsel to familiarize himself with the case.

¶ 33    On January 26, 2011, respondent's counsel informed the court that respondent wanted him to pursue an interlocutory appeal on the questions that had been previously certified in 2002. The case was continued for counsel to research what was needed to perfect an appeal given the age of the certification.  Following more continuances by agreement,[5] respondent's counsel informed the court on June 13, 2011 that the appellate court had granted respondent leave to file a late application for an interlocutory appeal. Counsel further stated that he "d[id]n't see any point in doing anything" in the trial court until the appeal was resolved. The trial court and the State both concurred, and so the case was continued by agreement. Respondent's appeal was dismissed for lack of jurisdiction on August 9, 2011.

---

[5] We note that during this time, respondent also filed a motion to dismiss challenging the constitutionality of the Act. The State filed a response and the motion was scheduled for argument, but it is unclear from the record whether the court ever ruled on it.

¶ 34    The case returned to the trial court on September 20, 2011, when the court granted respondent's motion to appoint Dr. Diane Lytton to evaluate him. The case was continued by agreement seven more times while Dr. Lytton prepared her report. On June 20, 2012, respondent's counsel stated that he had tendered Dr. Lytton's report to the State, scheduled depositions, and that the parties were "moving along in discovery."

¶ 35    The case was then continued by agreement seven more times.[6] On March 13, 2013, the State filed a motion for the appointment of a new evaluator to replace Dr. Buck. The State supported its motion with an affidavit from Dr. Buck and a letter from her physician stating that she was forced to retire for medical reasons and was no longer in a condition to testify at trial. The case was continued by agreement until May 29, 2013, when the court heard arguments on the State's motion. After another continuance by agreement, the court granted the State's motion on June 26, 2013.

¶ 36    The case was continued by agreement twice more to October 4, 2013. On that date, the State informed the court that its new evaluator, Dr. Deborah Nicolai, had completed her evaluation and report. The case was continued twice by agreement while respondent took Dr. Nicolai's deposition.

¶ 37    On January 15, 2014, the parties agreed for a jury trial to begin in May 2014 with motions *in limine* to be heard in March 2014. However, the trial would not begin before many years of additional continuances, nearly all of which were by agreement or by order of court for reasons not attributable to the State.

---

[6] Respondent was not present for a hearing on November 26, 2012 because he had been transferred back to IDOC after pleading guilty to committing a second aggravated battery while in DHS custody. Additionally, the continuance that occurred on January 14, 2013 involved respondent not being transported to court due to a "big accident" causing traffic problems.

¶ 38    For example, the case was continued twice by agreement to April 16, 2014 for the State to obtain additional documents to complete its motions *in limine*. The parties then agreed to postpone the trial date three times, twice because expert witnesses were unavailable and once because the assistant attorney general assigned to the case required medical leave.

¶ 39    On September 24, 2014, after the assistant attorney general returned from medical leave, the case was continued by agreement to November 12, 2014. The case was then continued by agreement to December 12, 2014 in order to set a new trial date. On that date, the parties agreed to argue motions *in limine* on March 11, 2015, with trial to begin on April 13, 2015. However, the parties later agreed that they would not be able to begin the trial in April due to the availability of expert witnesses and the "need to get updated evaluations from our doctors." The case was then continued by agreement several times while both parties obtained updated evaluations and finalized discovery.

¶ 40    On January 6, 2016, the parties informed the court that they were ready to begin trial on April 29, 2016 and to argue motions *in limine* on April 13, 2016.  However, the parties later agreed to postpone the trial date yet again due to more scheduling conflicts. Respondent, speaking *pro se*, expressed his frustration with the pace of proceedings, as well as with counsel's perceived lack of communication and unwillingness to file certain *pro se* motions on his behalf. Counsel explained that he determined none of respondent's *pro se* motions were "colorable," and stated that he would schedule a phone call with respondent to discuss the case further. After the court denied respondent leave to further address the court *pro se*, respondent nevertheless stated that he "want[ed] a new attorney." However, the court did not address the remark, and the case was continued by agreement.

¶ 41    On June 22, 2016, respondent's counsel informed the court that he was exploring some "possible motions" that respondent wanted him to file. The case was continued twice more by agreement until July 22, 2016. On that date, the case was continued by agreement once again to September 2016 because respondent was going on undergo back surgery.

¶ 42    In the meantime, respondent's counsel was granted leave to withdraw and a third counsel was appointed. After three more continuances by agreement, respondent's new counsel appeared in court on February 15, 2017. Counsel requested additional time to get acclimated with the case and investigate the viability of a "series of motions" that prior counsel had declined to file on respondent's behalf. Accordingly, the case was continued by agreement to April 13, 2017. At the hearing on that date, respondent again expressed his displeasure with the pace of the proceedings, counsel's lack of communication, and counsel's refusal to file certain motions on his behalf. Respondent informed the court that he and his family were in the process of "looking for another lawyer."

¶ 43    Nevertheless, the case was continued by agreement until May 16, 2017, when respondent's counsel informed the court that he needed more time to confer with respondent about "some motion practice we might want to engage in[.]" The case was therefore continued three times by agreement to October 17, 2017 and then to December 2017 due to respondent's "health issues."

¶ 44    On December 17, 2017, respondent's counsel stated that respondent asked him to re-file a *pro se* motion that "apparently was filed sometime in 2008." The case was continued by agreement so that counsel could investigate the motion. On January 25, 2018, respondent's counsel informed the court that he would not be adopting respondent's *pro se* motion. Respondent objected *pro se*, stating that he wished to represent himself if counsel would not adopt the motion.

¶ 45    The case was continued by agreement to January 30, 2018 for further proceedings on the respondent's motion. On that date, the court stated that it had received a "*pro se* motion to vacate probable cause order." The crux of the motion was that the State's petition should be dismissed because it was supported by Dr. Buck's assessment that a "Floyd Sebron," rather than Sebron Floyd, qualified as an SVP. This appears to be merely a scrivener's error, as the information underlying Dr. Buck's evaluation pertained to respondent.[7] Respondent's counsel advised that he remained unable to adopt the motion. The State requested a brief continuance to investigate the matter, stating that it believed a similar motion had already been litigated by one of respondent's previous attorneys. On March 6, 2018, the court docketed and denied the motion.

¶ 46    The case was next continued by agreement on several more occasions while the parties worked on various issues, including updating documents to reflect respondent's true name.

¶ 47    On October 25, 2018, respondent's counsel was granted leave to withdraw for "irreconcilable differences" after respondent filed a complaint against him with the Illinois Attorney Registration and Disciplinary Commission. The case was continued by agreement five more times while respondent chose new counsel, who was then appointed on February 20, 2019.

¶ 48    Over the next several months, the case was continued numerous times by agreement while both parties obtained updated evaluations. In April 2019, the court granted respondent's request to appoint Dr. Luis Rosell to replace Dr. Lytton. In May 2019, respondent was granted leave to replace Dr. Rosell with Dr. John Fabian.

---

[7] As with his date of birth, several variations of respondent's name appear on various documents in the record. However, respondent confirmed multiple times on the record that his true name was Sebron Floyd, and the court later ordered DHS records be updated to reflect the same.

¶ 49    On December 16, 2019, the State advised that respondent had tendered Dr. Fabian's completed report. The parties agreed to a "tentative" trial date of July 20, 2020, with motions *in limine* to be filed by March 23, 2020.

¶ 50    However, the case then encountered several delays as a result of the COVID-19 pandemic. The parties next appeared in court in July 2020 to discuss scheduling a new trial date. The case was continued by agreement to August 27, 2020 and then to September 10, 2020 for arguments on motions *in limine*.

¶ 51    At the September 10 hearing, the court heard arguments on motions *in limine* and respondent's newly-filed motion to dismiss the case on speedy trial grounds. The court denied the motion to dismiss, noting that respondent never demanded trial. Respondent filed a motion to reconsider, which was denied on October 1, 2020. That same day, respondent made both an oral and written demand for trial. However, over respondent's objection, the case was continued by order of court several times as the pandemic rendered it practically impossible to hold a jury trial.[8]

¶ 52    In February 2021, respondent filed a new motion to dismiss on speedy trial grounds because more than 120 days had passed since his October 1, 2020 trial demand. The court denied the motion on March 24, 2021, citing pandemic-related orders from the Illinois Supreme Court and the Cook County circuit court tolling speedy trial times.

---

[8] We note that, beginning in November 2020, the State answered ready for trial on each date respondent's trial demand remained in effect. However, the court informed the parties that jury trials were not likely to resume in Cook County so long as COVID-19 cases were "spiking uphill here in Illinois."

¶ 53    In May 2021, the court informed the parties that there was now an available trial date of July 26, 2021. The parties initially agreed to that date, but later postponed the trial until October 2021 because experts for both sides were unavailable in July.[9]

¶ 54    On October 4, 2021, the eve of trial, the State disclosed additional police reports pertaining to respondent's 1988 arrest for aggravated criminal sexual assault. Respondent filed a motion to bar any testimony regarding the reports, which was heard the following day. At the October 5 hearing, the State claimed that it did not close the reports sooner because they were only discovered while preparing for trial. The court denied respondent's motion to bar the reports, finding that either party could have discovered them sooner with the information about the arrest that was previously produced in discovery.

¶ 55    The case was continued by agreement to November 3, 2021, on which date respondent advised that he was not ready for trial because he had not yet conferred with his expert about the recently-disclosed police reports. The case was continued by agreement three more times while the parties attempted to reschedule the trial. On December 22, 2021, the parties agreed to begin the trial on July 26, 2022, apparently the earliest date on which the court and the parties' experts were all available.

¶ 56    On July 6, 2022, respondent filed a "Second Renewed Motion to Dismiss" on speedy trial grounds. The motion was based on the additional delays that had occurred since the denial of respondent's previous speedy trial motion in March 2021. The court denied respondent's motion, and the case proceeded to trial on July 27, 2022.

¶ 57                                D. Trial

---

[9] As respondent concedes, he voluntarily withdrew his trial demand on May 27, 2021 in order to accommodate his expert's schedule. Respondent did not make a renewed demand for trial.

¶ 58    At trial, the State called Dr. Nicolai and Dr. Edward Smith as expert witnesses in the fields of clinical and forensic psychology. Dr. Fabian testified for respondent as an expert in the same. All three experts based their testimony on police reports, court documents, and records from respondent's time in IDOC and DHS custody. Dr. Nicolai also interviewed respondent in September 2013, and Dr. Fabian interviewed him in October 2019 and November 2021. Respondent refused an interview with Dr. Smith.

¶ 59    The State's experts each diagnosed respondent with OSPD Nonconsent, antisocial personality disorder, and various substance abuse disorders. Dr. Nicolai explained that OSPD Nonconsent was the appropriate diagnosis because respondent had "demonstrated intense sexual interest in nonconsenting females by his history of forcing sexual activity on unsuspecting, unwilling females" and admitted that he got a "sexual thrill out of controlling another person." Similarly, Dr. Smith explained that he reached the same diagnosis because respondent's criminal history showed that he experienced "an intense sexual arousal" from sexual activity with nonconsenting women. Both experts also testified that OSPD Nonconsent was chronic in nature and unlikely to subside, especially without treatment. However, Dr. Nicolai acknowledged on cross-examination that OSPD Nonconsent is not specifically listed among the paraphilias in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), and that proposals to include OSPD Nonconsent in the DSM-5 have been rejected.

¶ 60    The State's experts both further testified that, to a reasonable degree of psychological certainty, respondent was substantially probable to commit additional acts of sexual violence in the future. In evaluating respondent's risk of reoffending, the State's experts both used the Static 99-R, which Dr. Nicolai described as "the most widely researched and most widely used actuarial instrument for sex offender risk assessments[.]" Drs. Nicolai and Smith both testified that

respondent scored a 5 on the Static 99-R, placing him in the category for "above average risk" of recidivism. A score of 5 was in the approximately 89th percentile and indicated that respondent was about 2.7 times more likely to reoffend than the typical sex offender. Dr. Smith testified that 12.8% of offenders who scored a 5 on the Static 99-R recidivated within 5 years and 18.8% of such offenders recidivated within 10 years. Dr. Nicolai also evaluated respondent using the Static 2002-R actuarial instrument, which yielded similar results as the Static 99-R.

¶ 61    Both of the State's experts further testified that respondent exhibited a variety of other "dynamic risk factors" associated with an increased chance of recidivism, including deviant sexual interests, general impulsivity, poor cognitive problem solving skills, lack of concern for others, resistance to rules and authority, and dysfunctional coping mechanisms. Both experts acknowledged on cross-examination that it was impossible to quantify precisely how much these factors increased an offender's risk of recidivism.

¶ 62    The State's experts also testified that they considered "protective factors" that could reduce an offender's risk of recidivism, but found that none applied to respondent. For example, both experts noted that respondent had consistently refused to participate in treatment while in custody. The State's experts also acknowledged that aging tends to reduce the risk of recidivism, but noted that respondent was only 50 years old at the time of trial and did not have any debilitating health issues that would prevent him from reoffending.

¶ 63    Based on the foregoing, both Dr. Nicolai and Dr. Smith opined that respondent met the criteria to be considered an SVP.

¶ 64    For the defense, Dr. Fabian testified that he diagnosed respondent with antisocial personality disorder and various substance abuse disorders. However, Dr. Fabian did not diagnose respondent with OSPD Nonconsent, opining that research showed "that a rape paraphilic disorder

does not exist and that it's misused in these types of proceedings." Dr. Fabian also testified that OSPD Nonconsent has been "rejected by the DSM numerous times." Thus, Dr. Fabian concluded that respondent did not have a qualifying mental disorder under the Act.

¶ 65    Nevertheless, Dr. Fabian conducted a risk assessment using the Static 99-R and Static 2002-R actuarial instruments. According to Dr. Fabian, respondent scored a 6 on the Static 99-R, placing him in the 90th percentile and the "well-above average" risk category. Dr. Fabian explained that 18.4% of typical sex offenders with the same score reoffended within 5 years and 26% percent reoffended within 10 years. These numbers were higher for "high risk" sex offenders, with 24.6% reoffending within 5 years and 41% reoffending within 10 years. Respondent also scored a 7 on the Static 2002-R, which corresponded with a 26.8% chance of reoffending within 5 years and a 45.7% chance of reoffending within 20 years.

¶ 66    When asked whether respondent was "substantially probable to engage in future acts of sexual violence," Dr. Fabian replied that there were "certainly" risk factors, but that respondent's age was a "potential mitigator." Ultimately, Dr. Fabian stated that he "c[ould]n't really answer that question." Regardless, Dr. Fabian opined that respondent would not qualify as an SVP because he did not have a mental disorder within the meaning of the Act.

¶ 67    Following closing arguments, the jury was instructed, among other things, that "[t]he diagnosis of [OSPD Nonconsent] is generally accepted in the psychological and psychiatric community." This instruction was given over respondent's objection, and the trial court denied respondent's request to further instruct the jury that " '[g]eneral acceptance' does not mean universal acceptance *** or even [acceptance] by a majority of experts." However, the court did grant respondent's request to instruct the jury that "[a]lthough, [*sic*] a particular technique or

methodology may be generally accepted in the scientific community you may decide whether to accept the expert's conclusion that it is based on that technique or methodology."

¶ 68    On July 29, 2022, the jury returned a verdict finding that respondent was an SVP. Respondent's posttrial motion was denied on November 9, 2022. Following a dispositional hearing on December 7, 2022, the trial court entered an order committing respondent to a secure DHS facility. This appeal followed.

¶ 69                                II. ANALYSIS

¶ 70                        A. Timeliness of the SVP Petition

¶ 71    On appeal, respondent first contends that the State's SVP petition was untimely. Respondent's argument involves a matter of statutory interpretation, which presents a question of law we review *de novo*. *In re Detention of Hardin*, 238 Ill. 2d 33, 40 (2010). In construing a statute, our goal is to effectuate the legislature's intent, which is best indicated by the plain and ordinary meaning of the statutory language itself. *Id.* Thus, we will not depart from the statute's plain language by reading into it exceptions, limitations, or conditions that conflict with the legislature's intent. *Id.*

¶ 72    At the time the State filed its petition in this case, section 15(b-5) of the Act provided that a petition must be filed:

> "No more than 90 days before discharge or entry into mandatory supervised release from a Department of Corrections correctional facility for a sentence that was imposed upon a conviction for a sexually violent offense, *or for a sentence that is being served concurrently or consecutively with a sexually violent offense*, and no more than 30 days after the person's entry into parole or mandatory supervised release[.]" (Emphasis added.) 725 ILCS 207/15(b-5)(1) (West 2002).

¶ 73    Respondent argues that the State's petition was untimely because it was not filed until March 20, 2002, long after his sentence for the sexually violent offense of aggravated criminal sexual assault was discharged in August 2001. The State, on the other hand, contends that the petition was timely because it was filed just two days before respondent entered MSR for his 2000 aggravated battery conviction, which the State maintains was served concurrently with the sexual assault sentence.

¶ 74    We agree with the State. Concurrent sentences are defined as "two or more terms of imprisonment, all *or part of* each term of which is served simultaneously[.]" (Emphasis added) Black's Law Dictionary, 291 (6th ed. 1990). Here, respondent served both the sexual assault sentence and the aggravated battery sentence from May 2000 until August 2001, when the sexual assault sentence was discharged. Although respondent asserts that his sentences were "no longer" concurrent once one was discharged, there is no requirement that concurrent sentences be entirely simultaneous. Nor is there any requirement that the sentences be imposed at the same time. Rather, under the plain meaning of the statute, it is sufficient that any part of the sentences be served simultaneously.

¶ 75    We also note that the facts of this case bear a striking resemblance to those in *In re Detention of Gavin*, 382 Ill. App. 3d 946 (2008) (*Gavin I*). There, the respondent entered a term of MSR for aggravated criminal sexual assault in April 1996. *Id.* at 948. However, the respondent burglarized a business while on MSR and was sentenced to 12 years in prison for that offense in March 1998. *Id.* The respondent's sentence for sexual assault was then discharged in April 1999, but the respondent remained incarcerated on his burglary sentence. *Id.* The State later filed its SVP petition in April 2006, five days before the respondent was to enter MSR for burglary. *Id.*

¶ 76    This court affirmed the denial of the respondent's motion to dismiss the petition as untimely, rejecting his argument that the sexual assault and burglary sentences were not concurrent. *Id.* at 950-51. Specifically, we stated that "[b]ecause [the respondent] was serving his burglary of a business sentence prior to the discharge of his sexual assault conviction, the burglary and sexual assault sentences were being served concurrently." *Id.* at 950. Accordingly, we held that the State's petition was timely. *Id.* at 951.

¶ 77    Respondent does not address *Gavin I*, and we see no way to distinguish it. Here, as in *Gavin I*, respondent began serving his aggravated battery sentence before the discharge of his sexual assault sentence. Thus, those sentences were concurrent. Additionally, the State filed its SVP petition less than 90 days prior to respondent entering MSR for aggravated battery. Thus, the petition was timely.

¶ 78                                    B. Speedy Trial

¶ 79    Respondent next contends that he was denied his right to a speedy trial where he was held in DHS custody for more than 20 years while awaiting trial.

¶ 80    The right to a speedy trial is a fundamental right guaranteed to criminal defendants under both the United States and Illinois Constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I § 8; *People v. Mayfield*, 2023 IL 128092, ¶ 18. Although proceedings under the Act are civil in nature, Illinois courts have held that the constitutional right to a speedy trial applies to SVP proceedings because respondents may be institutionalized and thus deprived of their liberty. *People v. Trainor*, 196 Ill. 2d 318, 329 (2001); *In re Commitment of Conley*, 2023 IL App (1st) 211084, ¶ 20. Additionally, section 35 of the Act confers a statutory right to a speedy trial. 725 ILCS 207/35 (West 2002). Although respondents possess both constitutional and statutory speedy

trial rights, the rights are not coextensive. *Mayfield*, 2023 IL 128092, ¶ 44. As respondent alleges a violation of both rights, we address each in turn.

¶ 81                                    1. Statutory Right to Speedy Trial

¶ 82     We first address respondent's argument that the State violated his statutory right to a speedy trial. At the outset, we must determine which version of the Act applies to this claim. Respondent contends that the version in effect at the time the State filed its original 1999 petition should apply. See 725 ILCS 207/35 (West 1998) (providing that a trial "shall commence no later than 45 days after the date of the probable cause hearing"). However, that petition was voluntarily dismissed after respondent's MSR was revoked due to his aggravated battery conviction. The State then filed a new petition in March 2002, by which point the Act was amended to extend the period in which the trial must begin to 120 days from the probable cause hearing. 725 ILCS 207/35 (West 2002). The State argues that the version of the Act in effect at the filing of the 2002 petition should apply.

¶ 83     We agree with the State that the 2002 version of the Act applies here, as that was the version in effect at the time the operative petition was filed. See *Conley*, 2023 IL App (1st) 211084, ¶ 31 (holding that a provision of the Act effective when the State filed its initial petition was not applicable where the initial petition was voluntarily dismissed, and the State filed a new petition after the provision was repealed). Although respondent contends that "retroactive" application of the 2002 version would be unconstitutional, our supreme court has held that lengthening the speedy trial time after a criminal defendant is charged is a procedural change that can be applied retroactively. *People v. Anderson*, 53 Ill. 2d 437, 438, 440-41 (1973). Respondent has identified no sensible reason why this would be any different in SVP proceedings. Thus, we will apply the 2002 version of the Act to respondent's statutory speedy trial claim.

¶ 84     As noted, the 2002 version provides that the trial "shall commence no later than 120 days after the date of the probable cause hearing[.]" 725 ILCS 207/35 (West 2002). However, "[d]elay is considered to be agreed to by the [respondent] unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." *Id.* Moreover, "[d]elay occasioned by the [respondent] temporarily suspends for the time of the delay the period within which [the respondent] must be tried." *Id.*

¶ 85     On appeal, the respondent bears the burden of affirmatively establishing a violation of his statutory right to a speedy trial. *In re Commitment of Sewell*, 2023 IL App (1st) 220168, ¶ 46. Put another way, the respondent must show that the delay in bringing the case to trial was not attributable to his own conduct. *Id.* The trial court's determination on who is responsible for delay is entitled to great deference, and we will sustain that determination absent a clear abuse of the court's discretion. *Id.* However, the ultimate question of whether a respondent's speedy trial right was violated remains subject to *de novo* review. *Id.*

¶ 86     Here, respondent's trial did not begin until July 2022, far more than 120 days after the probable cause hearing in April 2002. However, respondent did not demand trial until October 1, 2020. Moreover, as detailed above, respondent agreed to virtually all of the delays prior to his demand for trial. Accordingly, our statutory speedy trial analysis begins on October 1, 2020, the first day on which respondent demanded trial. *Id*. ¶ 47.

¶ 87     Respondent argues that his statutory right to a speedy trial was violated because the trial did not begin more than 120 days after his October 1, 2020 demand. However, in March 2020, the Cook County circuit court suspended the holding of new jury trials, and the Illinois Supreme Court issued a series of emergency orders tolling the time for speedy trial calculations in response to the extraordinary circumstances presented by the COVID-19 pandemic.

¶ 88    For example, on March 20, 2020, the Illinois Supreme Court issued an emergency order authorizing the chief judges of each circuit to continue trials for 60 days, specifically stating that any delays in criminal proceedings would not be attributable to the State for speedy trial purposes. Ill. S. Ct., M.R. 30370 (eff. Mar. 20, 2020). This order was later amended several times to exclude, in total, the entire period from March 20, 2020 to October 1, 2021 from statutory speedy trial calculations. See Ill. S. Ct., M.R. 30370 (eff. June 30, 2021); see also *Mayfield*, 2023 IL 128092, ¶¶ 23-39 (upholding the validity of the supreme court's pandemic orders). During this time, the Cook County circuit court also issued a series of general administrative orders pausing or limiting the holding of new jury trials and stating that any resultant delays would not be attributable to the State for speedy trial purposes. See *Sewell*, 2023 IL App (1st) 220168, ¶ 32 n.7 (collecting orders).

¶ 89    Respondent argues that these orders do not apply to the present case because the supreme court orders reference only criminal proceedings, whereas SVP proceedings are civil in nature. He also contends that the circuit court lacked the authority to toll speedy trial calculations. However, this court has already rejected these arguments and held that the pandemic orders apply to SVP cases. *Id.* ¶ 51 n. 9.

¶ 90    Regardless, we also find that the trial court at least implicitly found that the pandemic provided "good cause" to continue the case. See 725 ILCS 207/35 (West 2002) (allowing the trial court to delay a trial for "good cause"). In denying respondent's speedy trial motions, the trial court emphasized that it could not honor respondent's trial demand because "no jurors are being summoned to court." As we observed in *Sewell*, "[i]f a world-wide pandemic does not provide 'good cause' to toll the speedy trial computations under the Act, then we do not know what would." *Sewell*, 2023 IL App (1st) 220168, ¶ 52.

¶ 91     Having established that the pandemic orders tolled the time for speedy trial calculations, it is clear that respondent's claim fails. The orders tolled the period from March 20, 2020 to October 1, 2021. Respodent's trial demand was made on October 1, 2020, and, as he concedes, was permanently withdrawn on May 27, 2021. Thus, the pandemic orders tolled the entire period for which respondent's demand was in effect. Accordingly, respondent's right to a speedy trial was not violated.

¶ 92                           2. Constitutional Right to Speedy Trial

¶ 93     Respondent also argues that his constitutional right to a speedy trial was violated. Illinois courts analyze this issue using the four factors set forth by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530-33 (1972). *Conley*, 2023 IL App (1st) 211084, ¶ 21. Those factors are (1) the length of the delay, (2) the reasons for the delay, (3) the respondent's assertion of his right to trial, and (4) whether the respondent was prejudiced by the delay. *Id.* All four factors are closely related, and no single factor is dispositive. *Id.* Each factor must be considered and weighed according to the totality of the circumstances and the record as a whole. *Sewell*, 2023 IL App (1st) 220168, ¶ 55. The trial court's relevant factual determinations, if any, will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Id.* However, the ultimate question of whether the respondent's right was violated is reviewed *de novo*. *Id.*

¶ 94     We begin with the first factor, the length of the delay. Generally, "[a] speedy trial inquiry will not be triggered unless the complained-of delay crosses the threshold from ordinary to 'presumptively prejudicial,' which has generally been found to be a delay approaching one year." *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 67. The length of the delay in this case, some 20 years, is clearly extraordinary and presumptively prejudicial. Although this factor weighs heavily in respondent's favor, it does not mean that he was actually prejudiced. *Conley*, 2023 IL App (1st)

211084, ¶ 22. Rather, a presumptively prejudicial delay "only triggers the analysis of the remaining three *Barker* factors." *Sewell*, 2023 IL App (1st) 220618, ¶ 57.

¶ 95     The second factor is the reason for the delay. For this factor, different reasons for delay are assigned different weight. *People v. Crane*, 195 Ill. 2d 42, 53 (2001). For instance, intentional delays by the State have greater weight than more neutral reasons such as the unavailability of witnesses or a crowded court docket. *Id.* Additionally, delay is attributable to the respondent when he either caused the delay or he acquiesced to the delay by agreeing to continue the case. *People v. Davila*, 2022 IL App (1st) 190882, ¶ 83; see also *Sewell*, 2023 IL App (1st) 220168, ¶ 61 ("[A]n agreement to continue the case is properly chargeable to the respondent, and a respondent is bound by the acts of his attorney.").

¶ 96     Here, there were 7434 days between the filing of the State's petition in March 2002 and the start of trial in July 2022. [10] Perhaps unsurprisingly, the parties have greatly different views on who was responsible for the bulk of the delay. However, our calculations are far closer to the State's. By our count, 100 days, or about 1.3% of the total delay, were attributable solely to the State for reasons such as the unavailability of the trial judge or lawyers for the State, or for the failure to transport respondent to court. This number also includes 36 days of delay for reasons not specified in the record, for which the State concedes responsibility. Another 316 days, or about 4.3% of the overall delay, was caused by the COVID-19 pandemic. As explained, this delay is justified and not fairly chargeable to either party. *People v. Johnson*, 2023 IL App (4th) 210662, ¶ 62 ("[N]either the State nor the defendant is responsible for the delay in proceeding to trial in the

_____

[10] We note that respondent calculates the delay from June 1999, when the State filed its original SVP petition. However, because that petition was voluntarily dismissed, the relevant starting date is March 20, 2002, when the State filed the operative petition in this case. *Conley*, 2023 IL App (1st) 211084, ¶¶ 22-23. Either way, however, the length of the delay was excessive and weighs heavily in respondent's favor.

face of the public safety concerns created by the COVID-19 pandemic, as such delays are unavoidable."). The remaining delays are attributable to respondent, including 277 days (or about 3.7% of the total delay) caused solely by respondent for reasons such as his counsel's failure to appear in court or the filing of motions and interlocutory appeals. See *Davila*, 2022 IL App (1st) 190882, ¶ 83 (a defendant is bound by the actions of his attorney for speedy trial purposes). Importantly, the record shows that 6741 days, or a whopping 90.7% of the overall delay, were due to continuances by agreement, which are chargeable to respondent. *Id.* Excluding the pandemic-related delays from the equation, this means respondent either acquiesced to or caused approximately 98.6% of the delay in bringing this case to trial. Because respondent is responsible for the vast majority of the delay, this factor does not weigh in his favor.

¶ 97    The third factor, the assertion of the right to a speedy trial, is also unhelpful to respondent. As noted, respondent acquiesced to almost all of the delay in this case and did not demand trial until October 1, 2020, more than 18 years after the State filed its SVP petition. We also observe that respondent made his demand at a time when he was aware that the COVID-19 pandemic made holding a jury trial a practical impossibility. Moreover, respondent withdrew his demand in May 2021, and then agreed to an additional 426 days of delay before his trial began. Thus, this factor weighs significantly against respondent.

¶ 98    The fourth and final *Barker* factor, prejudice, "is assessed in light of the interests of defendants that the speedy trial right was designed to protect—preventing oppressive pretrial incarceration, minimizing the defendant's anxiety and concern about the pending charge, and limiting the possibility that the defense will be impaired by the delay." *Holmes*, 2016 IL App (1st) 132357, ¶ 75 (citing *Crane*, 195 Ill. 2d at 59). The most serious of these rights is the possibility of impairing the defense, as this "skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

¶ 99    Although we do not minimize the length of the delay in this case, we must conclude that respondent has failed to demonstrate how he was actually prejudiced by it. Rather, respondent asserts only that "[t]he prejudice is manifest" in light of the lengthy delay in bringing the case to trial. However, even an extraordinary delay does not mean that the delay alone has resulted in prejudice. *Conley*, 2023 IL App (1st) 211084, ¶ 22. We also note that SVP proceedings differ from criminal proceedings in that the former typically relies only on expert testimony and focuses on whether the respondent qualifies as an SVP *at the time of trial*, whereas the latter examines whether the defendant committed a crime *in the past*. See *Sewell*, 2023 IL App (1st) 220168, ¶ 66 (citing *Camacho v. Superior Court of Merced County*, 15 Cal.5th 354, 392 (2023)).  Thus, the danger that the respondent's defense in an SVP proceeding might be impaired by the passage of time is lessened as compared to criminal proceedings. *Id.* With that in mind, neither the record nor respondent reveals any specific way he was prejudiced, even setting aside the fact that the delay was mostly occasioned by respondent himself.

¶ 100   We further acknowledge that the impairment of liberty and pretrial anxiety were significant in this case. Yet, we cannot say that they rise to the level of actual prejudice. See *Sewell*, 2023 IL App (1st) 220168, ¶ 67 (finding no prejudice where the respondent's pretrial incarceration was "not oppressive" despite nearly 15 years of delay). Respondent notes that in 2002, he filed a motion arguing that he was being unjustly held in segregation while in DHS custody. He asserts on appeal that an investigation into his motion, which was denied on jurisdictional grounds, "could have been used to determine prejudice" with respect to the conditions of his detention. However, the record as it stands does not reveal why or for how long respondent was held in segregation.[11] The

---

[11] According to respondent's motion, the reasons given for his segregation include that he "is a liar, has been insolence [*sic*], disobeyed a direct order, and that nude photos were sent to him[.]"

record does show that respondent was less than a model detainee, as he accumulated more than 100 disciplinary infractions and two aggravated battery convictions during his time in custody. The record also demonstrates respondent's history of filing meritless allegations against those he feels have wronged him. Put simply, the fact that respondent alleged, in a denied and bare-bones motion, that his confinement was oppressive does not mean that he was prejudiced. Thus, the fourth *Barker* factor does not weigh in his favor.

¶ 101   In summary, we by no means condone the inordinate delay in bringing this case to trial, and we weigh the delay heavily in respondent's favor. However, our review of the record leaves us with the distinct impression that respondent did not want a speedy trial, as he occasioned the vast majority of the delay and only briefly demanded trial more than 18 years after the State filed its petition. Additionally, respondent has made essentially no attempt to show that he was actually prejudiced by the delay. Accordingly, after carefully balancing all of the *Barker* factors, we conclude that respondent was not denied his right to a speedy trial.

¶ 102                                C.  *Frye* Standard

¶ 103   Respondent next argues that the trial court erred in admitting the diagnosis of OSPD Nonconsent under the standard set forth in *Frye v. United States*, 54 App.D.C. 46 (1923). Respondent contends that the court should have adopted the "heightened standards of *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)] or *Frye*-plus-reliability" in determining the admissibility of psychological diagnoses. According to respondent, the *Frye* standard is inappropriate in SVP cases due to the "fallibility of the soft science of psychology" and because it is "vulnerable to being exploited by small but unified groups of practitioners in a field who wield a particular methodology in self-serving ways."

¶ 104  However, we need not entertain respondent's argument at length, as binding precedent firmly establishes that Illinois courts use the *Frye* standard to govern the admission of scientific evidence. *In re Detention of New*, 2014 IL 116306, ¶ 25. Additionally, we have consistently held that an OSPD Nonconsent diagnosis is generally accepted within the scientific community and therefore admissible under the *Frye* standard. See, *e.g.*, *Sewell*, 2023 IL App (1st) 220168, ¶ 91; *Brown*, 2021 IL App (1st) 191606, ¶ 91; *Adams*, 2021 IL App (1st) 182049, ¶ 56; *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶¶ 58-62.

¶ 105  Indeed, respondent concedes that, in light of this precedent, "this Court cannot choose to abandon the *Frye* standard and adopt the *Daubert* standard." Yet, he only raises the issue "lest it be waived in a further appeal to the Illinois Supreme Court[.]" Because respondent gives us no reason to depart from our established precedent, we decline to do so.

¶ 106                              D. Jury Instructions

¶ 107  We next address respondent's contention that the trial court erred by instructing the jury that OSPD Nonconsent is "generally accepted" to be a mental disorder in the psychological and psychiatric communities.

¶ 108  Generally, a trial court's decision on whether to grant or deny a particular jury instruction is reviewed for an abuse of discretion. *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶ 19. In determining whether a trial court abused its discretion, the relevant question on appeal is whether, taken as a whole, the jury instructions fully and fairly apprised the jury of the applicable law. *Id.* Jury instructions do not warrant reversal on appeal "unless they clearly misled the jury and resulted in prejudice to the appellant." *Id.*

¶ 109  Here, the jury was instructed, among other things, that "[t]he diagnosis of [OSPD Nonconsent] is generally accepted in the psychological and psychiatric community." Respondent

maintains that the instruction was misleading because, despite the "specific legal definition" of the term "general accepted," the jury was "forced to rely on the common (but incorrect) meaning" which suggested that OSPD Nonconsent was accepted by "either the majority of or every member of the psychological and psychological communities." Respondent also contends that the trial court's instruction invaded the province of the jury to decide how to weigh the evidence, thereby allowing the State to "shield its case from cross-examination and scrutiny as it related to the burden of proving the mental disorder element" of the Act.

¶ 110   We disagree. First, there is no dispute that the court's instruction was a legally accurate statement of Illinois law. See *Brown*, 2021 IL App (1st) 191606, ¶ 91 ("Illinois courts have consistently held that OSPD nonconsent is generally accepted within the scientific community."). Second, the record belies respondent's assertion that the jury was "forced" to believe that either all or a majority of experts accepted OSPD Nonconsent. Indeed, Dr. Fabian, one of three experts to testify in this case, testified at length as to why he and other researchers did not accept OSPD Nonconsent as a legitimate mental disorder and why it has been "rejected by the DSM numerous times." Similarly, the record shows that the State's case was not shielded from scrutiny as respondent claims. Rather, the controversy surrounding OSPD Nonconsent was a major topic of cross-examination, and Dr. Nicolai readily conceded that specific proposals to include the diagnosis in the DSM-5 were rejected. Thus, the jury was clearly aware that a significant number of experts did not accept the diagnosis. In short, respondent's contention that the jury was misled by the instructions amounts to little more than speculation.

¶ 111   Nor can we say that the court's instructions invaded the province of the jury to weigh the expert testimony. To the contrary, the very next sentence of the instructions informed the jury that "[a]lthough, [*sic*] a particular technique or methodology may be generally accepted in the scientific

community you may decide whether to accept the expert's conclusion that it is based on that technique or methodology." The jurors were also properly instructed that they were "the only judges of the credibility of the witnesses" and that they "must decide the weight to be given to the testimony of each of them." The trial court further instructed the jury that it need not afford any weight to testimony despite the fact that the witness was an expert in their field. Under these circumstances, respondent has failed to show that he was prejudiced by the trial court's instructions. Accordingly, there is no basis on which to reverse the judgment below.

¶ 112                           E. Sufficiency of the Evidence

¶ 113   Finally, respondent argues that the State failed to prove that he was an SVP beyond a reasonable doubt. Under the Act, the State must prove beyond a reasonable doubt that the respondent (1) was convicted of a sexually violent offense enumerated in the Act and (2) has a mental disorder that (3) makes it substantially probable that he will engage in future acts of sexual violence. 725 ILCS 207/5(f), 35(d) (West 2002); *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. The Act defines "mental disorder" as "a congenital or acquired condition affecting the emotional and volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2002). The term "substantially probable" means "much more likely than not." *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 62.

¶ 114   When reviewing the sufficiency of the evidence, a reviewing court asks whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the Act beyond a reasonable doubt. *Fields*, 2014 IL 115542, ¶ 20. It is the trier of fact's responsibility to resolve conflicts in the evidence, determine the credibility of witnesses, and decide what weight is afforded to witness testimony. *Moody*, 2020 IL App (1st) 190565, ¶ 43. Thus, we may not substitute our judgment for that of the trier of fact, and will not reverse its

decision unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *Id.*

¶ 115 Here, respondent does not appear to dispute the first two elements, that he was convicted of a sexually violent offense and has a mental disorder within the meaning of the Act. Rightly so, as the parties stipulated that respondent was convicted of aggravated criminal sexual assault, which is enumerated as a sexually violent offense in the Act. See 725 ILCS 207/5(e) (West 2002) (defining "[s]exually violent offense"). Additionally, both of the State's experts testified to a reasonable degree of psychological certainty that respondent suffered from OSPD Nonconsent. See *Conley*, 2023 IL App (1st) 211084, ¶¶ 47-48  (OSPD Nonconsent qualifies as mental disorder under the Act).

¶ 116 Rather, respondent challenges only the third element, that his mental disorder makes him substantially probable to commit future acts of sexual violence. To that end, he argues that the State's experts failed to adequately explain the bases for their opinions by relying too heavily on generic, unquantified descriptions that certain factors increased his risk of recidivism. In advancing this argument, respondent relies almost exclusively on two cases, both of which are readily distinguishable.

¶ 117 First, in *In re Commitment of McCormack*, 2021 IL App (1st) 181930-U, ¶ 12, the State's expert testified that the respondent had a "statistically 'average risk' of reoffending" based on actuarial instruments. This court also concluded that the State "left too much to inference" in questioning its expert such that the expert never explained why the respondent's risk of recidivism was substantial. *Id.* ¶ 42. Further, this court criticized the trial court's reliance on several aggravating factors that were either "contradict[ed]" by the evidence or were "[d]isproven" to apply to the respondent. *Id.* ¶¶ 30-41.

¶ 118   Similarly, in *In re Commitment of Gavin*, 2024 IL App (1st) 230246, ¶¶ 47-69 (*Gavin II*), this court found insufficient evidence where the State's lone expert "often undercut his own assessments" and often "buckled when asked how he reached his conclusions."[12] For example, the State's expert admitted he did not have sufficient information as to how the respondent's age and health conditions would affect his likelihood of reoffending even though the respondent was 60 years old at the time of trial, had a hip replacement, and walked with a cane. *Id.* ¶¶ 62-63.

¶ 119   The present case bears little resemblance to either *McCormack* or *Gavin II*. Here, the State's experts both testified that respondent scored in the "above average risk" category on the actuarial instruments and explained the precise recidivism statistics associated with his scores. Dr. Fabian, respondent's own expert, testified that respondent actually scored slightly higher on these instruments, and seemed to base his conclusion that respondent was not an SVP more on his opinion that OSPD Nonconsent "does not exist" than on respondent's probability of reoffending.[13]

¶ 120   In any event, the State's experts also explained the presence of various dynamic factors that increased respondent's likelihood of recidivism, as well as the reasons they concluded that respondent exhibited those factors. The State's experts further addressed possible protective factors, again explaining why they concluded that none applied to respondent. For example, they noted that respondent had consistently refused to participate in treatment, and opined that his age and health issues were not so far advanced as to prevent him from engaging in sexual violence.

¶ 121   Although the specific facts of every case are unique, this case is well in line with a multitude of cases finding sufficient evidence that the respondent was an SVP. See, *e.g.*, *Conley*,

---

[12] On December 31, 2024, we allowed respondent's motion to cite *Gavin II* as additional authority.

[13] As noted above, when asked directly whether respondent was substantially probable to reoffend, Dr. Fabian equivocated before stating that he "c[ould]n't really answer that question."

2023 IL App (1st) 211084, ¶¶ 47-48; *In re Commitment of Holt*, 2022 IL App (1st) 210402, ¶¶ 71-82; *In re Commitment of Montilla*, 2022 IL App (1st) 200913, ¶¶ 117-121; *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶¶ 65-66; *Adams*, 2021 IL App (1st) 182049, ¶¶ 60-61; *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶¶ 68-77; *Moody*, 2020 IL App (1st) 190565, ¶ 63; *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 26. Despite respondent's arguments, we are mindful that "[i]t is the province of the jury to evaluate the results of any testing along with the other evidence presented to determine whether he was 'substantially probable' to reoffend." *Haugen*, 2017 IL App (1st) 160649, ¶ 25. When viewed in the light most favorable to the State, the evidence adduced in this case was sufficient for a rational jury to conclude that respondent was SVP beyond a reasonable doubt.

¶ 122                                    III. CONCLUSION

¶ 123   For the reasons stated, we affirm the judgment of the circuit court.

¶ 124   Affirmed.