NOTICE
Decision filed 12/22/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240573-U

NO. 5-24-0573

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF SHANE PATTEN | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-MR-1324 |
| | ) | |
| Shane Patten, | ) | Honorable |
| | ) | Timothy D. Berkley, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices McHaney and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the respondent's civil commitment as a sexually violent person where sufficient evidence was submitted at trial to support the judgment, and the trial court considered the proper factors.

¶ 2   On March 19, 2024, after a bench trial, the trial court found the respondent, Shane Patten, to be a sexually violent person (SVP) pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2022)), and he was committed to the Illinois Department of Human Services (DHS). The respondent appeals, arguing (1) that the State failed to prove beyond a reasonable doubt that he suffered from a mental disorder and that he was substantially likely to engage in future acts of sexual violence, and (2) that the trial court's order was improper given the

1

factors set forth in section 40(b)(2) of the Act (*id.* § 40(b)(2)). For the following reasons, we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4    On December 11, 2020, the State filed a petition pursuant to the Act seeking to have the respondent adjudicated an SVP and committed to the care and custody of DHS. The petition alleged that the respondent was convicted of attempt predatory criminal sexual assault, a sexually violent offense under the Act, and sentenced to eight years' incarceration in the Illinois Department of Corrections (IDOC). The respondent had been evaluated by Dr. Angeline Stanislaus, a forensic psychiatrist, who submitted a report dated December 7, 2020. In that report, Dr. Stanislaus diagnosed the respondent with pedophilic disorder, sexually attracted to males, nonexclusive type, hebephilia, and antisocial personality disorder. The petition alleged that the respondent was dangerous to others because he suffered from mental disorders that made it substantially probable that he would engage in future acts of sexual violence.

¶ 5    On December 15, 2020, following a hearing, the trial court found probable cause that the respondent was subject to commitment under the Act. The trial court ordered him to be detained at a facility approved by DHS and to undergo an evaluation by DHS.

¶ 6    The matter proceeded to bench trial on March 19, 2024. At trial, the State presented the testimony of Dr. Stanislaus and Dr. David Suire. Dr. Stanislaus was qualified as an expert in forensic psychiatry, with a specialty in sexually violent persons evaluations, diagnosis, and risk assessment. She had completed more than 100 evaluations pursuant to the Act. She testified that she conducted an SVP evaluation of the respondent. She reviewed records relating to the respondent's history for any sex related offense, charge, or conviction, as well as his general criminal history. She also reviewed the respondent's file from IDOC. Dr. Stanislaus further

2

conducted a clinical interview with the respondent. She then completed a report summarizing her evaluation and stating her opinion. After completing her report, she reviewed additional records from the treatment and detention facility, but her opinion did not change.

¶ 7    Dr. Stanislaus testified to the facts relating to the respondent's first sexual offense. During her evaluation, she learned that in 2002, the respondent was charged with two counts of predatory criminal sexual assault and one count of aggravated criminal sexual abuse of a three-year-old boy that had occurred in 1999. The child's mother had been living with the respondent and his sister, and after the respondent had babysat the child, the child reported to his mother that his butt hurt because the respondent had put his penis in it. The Illinois Department of Children and Family Services (DCFS) became involved and indicated the report, but no charges were filed at that time. The respondent was approximately 23 years old at the time the incident occurred.

¶ 8    According to Dr. Stanislaus, in 2002, the respondent announced at church during prayer that God told him to ask if anyone wanted to have sex with him to raise their hand. Church officials later approached him to inquire as to the incident, and the respondent disclosed to them that he had molested a three-year-old boy and was also in a sexual relationship with a 14-year-old boy. He further disclosed an interest in other children in the church. Regarding the three-year-old boy, the respondent disclosed that he was attracted to and felt love for the boy, and if it was wrong then God would have stopped him. Church officials reported the disclosures to police. The respondent ultimately pled guilty to one count of aggravated criminal sexual abuse and was sentenced to three years in IDOC. In April of 2003, the respondent was released on parole, and in June of 2003, he violated his parole by using cannabis and by having contact with at least three minor children.

¶ 9    Dr. Stanislaus testified that she also reviewed the respondent's 2016 case wherein he was charged with attempted predatory criminal sexual assault and aggravated criminal sexual abuse.

3

In that case, the respondent pled guilty to attempted predatory criminal sexual assault and was sentenced to eight years in IDOC. Dr. Stanislaus testified that through her evaluation she learned that in September 2016 a neighbor reported to police that the respondent had molested her two sons, a 15-year-old and a 12-year-old. The children had frequently spent time at the respondent's home until the respondent told the mother that he found the 15-year-old attractive. The mother then limited the children's contact with the respondent after that incident. She later spoke with the children and learned that the respondent had performed oral sex on the 15-year-old. She also learned that the respondent had pulled down and ripped the underwear of the 12-year-old and that the respondent had attempted to put his mouth on the child's penis while playing wrestling. Another time the respondent asked the 12-year-old to fondle his penis. The respondent was approximately 40 years old at this time of these incidents.

¶ 10    Dr. Stanislaus then testified that the respondent had seen a psychiatrist and had mental health evaluations while in IDOC. Through her review of those records she learned that the respondent had reported to his treatment provider that he was attracted to young boys. He had also admitted to the provider that he had molested the three-year-old boy in 1999. She also stated that she had reviewed updated treatment records from the current treatment facility, and that the respondent was participating in sex offender treatment and admitted to molestations and sexual attraction to boys in treatment.

¶ 11    After reviewing these records, Dr. Stanislaus diagnosed the respondent with (1) pedophilic disorder, sexually attracted to boys or males, nonexclusive; (2) other specified paraphilic disorder, sexually attracted to boys who are not fully mature, also called hebephilia; and (3) antisocial personality disorder. Dr. Stanislaus explained the elements of each mental condition, their

4

definitions under the American Psychiatric Association Diagnostic Statistical Manual (DSM-5), and how the respondent qualified for each diagnosis.

¶ 12    Dr. Stanislaus testified that she had diagnosed the respondent with pedophilic disorder because he had sexually molested a three-year-old boy, stated that he was sexually attracted to the child, and stated that he loved the child. He had also previously disclosed in treatment that he was attracted to young children. Dr. Stanislaus also diagnosed the respondent with hebephilia because he reported a sexual interest in boys who were just developing, and in 2016, one of his victims was a 12-year-old boy. Dr. Stanislaus explained that with pedophilic disorder, the brain is wired to sexually respond to young children, and while the behaviors can be managed, the interest itself does not go away. She further testified that both pedophilic disorder and hebephilia are either congenital or acquired, and they affect the respondent's emotional or volitional capacity and seriously impact his ability to control his sexually violent behavior. She noted that after going to prison for the first incident, the respondent then sexually molested a 12-year-old boy in 2016. Dr. Stanislaus stated that the diagnosis of pedophilic disorder and hebephilia were current as of the date of her testimony.

¶ 13    Dr. Stanislaus then testified that she also diagnosed the respondent with antisocial personality disorder. She stated this is usually characterized by multiple repeated legal issues, including arrests, and stated that the respondent exhibited characteristics of antisocial personality disorder. Dr. Stanislaus stated that this diagnosis was current as of the date of her testimony.

¶ 14    Dr. Stanislaus then testified as to her assessment of risk. She conducted an assessment using an actuarial instrument, the Static-99R, which aids in determining an individual's risk of reoffending. The Static-99R uses 10 risk factors that are calculated to determine an offender's risk category compared to other sex offenders. The score places the offender in a category of risk of

5

future recidivism as compared to other sex offenders. Those categories of risk are very low; low; moderate; moderate high; and high. Dr. Stanislaus scored the respondent a 4A on the Static-99R, which put him in the second-highest risk category of moderate high, and indicated an above average level of risk to sexually offend.

¶ 15 Dr. Stanislaus then explained how the respondent's nonsexual history was considered with respect to risk. She indicated that it is important to look at someone's history of legal trouble and inability to follow rules, including supervision rules and parole violations. She explained that if someone cannot follow rules, they are much more likely to engage in the same behaviors again. She stated that this would be both a dynamic risk factor and a pattern of rule-breaking that would be captured on the static risk factor instrument she administered.

¶ 16 Dr. Stanislaus defined a dynamic risk factor as a trait that drives a person's sexual offending; in this case, the respondent's propensity to molest children. She identified both deviant sexual interest generally, and deviant sexual interest specifically in children, as dynamic risk factors that applied to the respondent. She also identified emotional congruence with children as a dynamic risk factor, and explained that falling in love with a child, feeling romantically connected to a child, and having romantic relationships with children increased risk. Another dynamic risk factor she identified was the general regulation of a person's life, and she explained that the respondent had difficulty regulating his life in the community. The last dynamic risk factor she considered was the parole violation, where the respondent was released from prison in April 2003 and by June 2003 was having children in his home and having contact with children, a violation of the rules of his parole.

¶ 17 Dr. Stanislaus also identified several protective factors that can decrease risk of reoffending. These include debilitating medical conditions, progress in treatment, and age. Dr.

Stanislaus testified that none of these factors applied to the respondent. Regarding the progress in treatment factor, Dr. Stanislaus stated that because the respondent was in the very early stages of phase two, out of a possible five stages of treatment, he had not made enough progress for the treatment-related protective factor to lower her assessment of risk.

¶ 18    Dr. Stanislaus then agreed that actuarial instruments, dynamic factors, and lack of protective factors were all considered in her forming an opinion as to the respondent's risk. She stated to a reasonable degree of psychiatric certainty that it is substantially probable that the respondent will commit another sex offense if not confined. She defined substantially probable as much more likely than not.

¶ 19    On redirect, Dr. Stanislaus testified regarding a separate evaluation conducted by Dr. Elaine Bochenek, a clinical psychologist, wherein Dr. Bochenek only diagnosed the respondent with antisocial personality disorder and cannabis use disorder. Dr. Stanislaus explained that she disagreed that the antisocial personality disorder was the only condition driving the respondent's criminal behavior. She stated that regarding the law's requirement of a propensity to commit future acts of sexual violence, the respondent's propensity comes from his pedophilic disorder. She stated that while the antisocial disorder motivates the respondent to get what he wants when he wants it, the pedophilic disorder drives the desire to be with children and molest them.

¶ 20    Dr. Stanislaus also explained that a scored static risk level can be impacted by dynamic and protective factors, either going up or down depending on the factors. She stated again that in this case; she concluded that the respondent was much more likely to commit future acts of sexual violence. She agreed that when the respondent spoke out in church, he was seeking help but noted that he reoffended even after that incident.

7

¶ 21 The State's next witness was Dr. David Suire. Dr. Suire was qualified as an expert in clinical psychology with expertise in sex offender evaluation and risk assessment. He had completed approximately 3,500 evaluations of varying types. He explained that for his evaluation of the respondent, he reviewed records from IDOC; police records; court records; and DHS records. He then attempted to conduct an interview with the respondent in approximately February 2021, but the respondent had declined.

¶ 22 Dr. Suire testified that the respondent met the first criteria for an SVP where he had convictions for aggravated criminal sexual abuse and attempted predatory sexual assault. Regarding the mental disorder requirement, Dr. Suire diagnosed the respondent with pedophilic disorder, sexually attracted to boys, non-exclusive type, as well as unspecified personality disorder. Dr. Suire explained that pedophilic disorder requires urges, fantasies, or behaviors involving sexual contact with children 13 years of age or younger, enduring over at least a six-month period and causing significant distress to the person or harm to others.

¶ 23 Dr. Suire explained that he diagnosed the respondent with pedophilic disorder based on his having had sexual contact with a three-year-old boy in 1999; having had sexual contact with a 12-year-old boy in 2016; his self-report of a long history prior to 1990 wherein he was attracted to young children; his self-report of sexual contact with a five-year-old girl at age 15; his admission to having contact with other minor children; and his parole violation where he had unsupervised contact with underage children, including a 9-year-old male. Dr. Suire noted that in a 2002 police interview, the respondent disclosed his attraction to children and stated that he needed help with it. Dr. Suire also noted that the respondent's attraction is both sexual and emotional, and explained that the emotional component makes it more difficult to give up the sexual component of the condition. Dr. Suire explained that the respondent would need to stay away from children entirely

8

to manage his condition. Dr. Suire then noted that in September 2023 the respondent stated that when children reach puberty, they should be able to have sex with whoever they want. Dr. Suire stated that this demonstrated the respondent's difficulty in fully accepting the wrongness of the behavior. Dr. Suire also noted that while the respondent was doing well in treatment, as early as January 2024 the respondent stated that he still had the interests.

¶ 24 Dr. Suire was asked about the respondent's diagnosis of hebephilia by Dr. Stanislaus. He stated that he thought it was a reasonable diagnosis. He explained that he did not give that diagnosis because the primary interest of the respondent is in children 13 years old and younger, but it was fair to say that the respondent has hebephilia as well.

¶ 25 Regarding the conclusion of Dr. Elaine Bochenek, Dr. Suire explained that with antisocial personality disorder, if it exists with a paraphilic disorder like pedophilia, it will make the person more likely to act on the urges. He further explained, however, that there is no reason a person with antisocial personality disorder alone would have an interest in prepubescent children. He stated that while antisocial personality disorder can be an aggravating factor, it would not lead one to be attracted to a three-year-old child; such an attraction is its own disorder.

¶ 26 Regarding his diagnosis of unspecified personality disorder, Dr. Suire explained that a personality disorder is a characterological way of looking at the world that leads to difficulties in functioning and interactions with others. It is different from an affliction; it is who you are, but it causes you difficulties. Dr. Suire agreed that the respondent met the criteria for antisocial personality disorder diagnosed by Dr. Bochenek. Dr. Suire also suspected that the respondent had additional personality disorders, but he did not want to determine any additional disorders without an interview.

9

¶ 27 Dr. Suire then explained that, in addition to pedophilic disorder, he believed the respondent's antisocial personality disorder would also meet the criteria for a qualifying mental disorder under the Act. He stated that the respondent's history of difficult relationships, including very conflicted, violent, unhealthy relationships with adults, indicated that his personality disorder will make it difficult for him to form healthy relationships with adults. This will make it more likely that he will seek out contact with children.

¶ 28 Regarding risk assessment, Dr. Suire explained that he considered actuarial data from formal risk assessments, aggravating factors, and protective factors in assessing risk. He utilized two risk assessment actuarial instruments in the respondent's evaluation, the Static-99R and Static-2002R. Dr. Suire scored the respondent a four on the Static-99R, placing him in the above average risk category, meaning he is 1.94 times as likely as a typical sex offender to be convicted of another sex offense in the future. Dr. Suire testified that because of the nature of sex offenses, not every sex offense is detected, so the instrument underestimates risk.

¶ 29 Dr. Suire scored the respondent a four or five on the Static-2002R. He stated that he was not sure whether the three-year-old victim was related to the respondent. He stated that if they are related then the respondent scored a four, and if they are not related then the respondent scored a five. If the score was a four, then he would be in the average risk category and 1.39 times as likely to be convicted of another sex offense as a typical sex offender. If he scored a five, he would be in the above average risk category and 1.9 times as likely to be convicted of another sex offense as a typical sex offender.

¶ 30 Dr. Suire again emphasized that the actuarial instruments are understood to underestimate risk. He stated that it is likely in this case that the respondent's risk scores underestimate his level of risk for multiple reasons. First, the respondent reported having additional child victims, but the

10

number of additional victims is unknown. Second, after his first conviction while out on parole, the respondent had contact with multiple children despite having been seriously sanctioned with prison time and being under supervision. This indicates an inability to control behavior. Dr. Suire also found it important that the respondent does not fully accept that the behavior is wrong. Dr. Suire explained that with actuarial data, where the primary driver is deviant arousal, the instrument tends to underestimate the score. When someone's strong attraction to children is the primary driver of behavior, they tend to score lower.

¶ 31    Dr. Suire then explained his consideration of protective factors. He stated that there was nothing about the respondent's health condition that acted as a protective factor. The actuarial instruments gave reduction in risk for the respondent's age, so no additional reduction was given for that factor either. Regarding progress in treatment, Dr. Suire explained that the respondent had been in treatment consistently since March 2023 and had several treatment-interfering beliefs. The first was difficulty accepting the wrongness of having sexual contact with children. The second was recounting events wherein the victims were portrayed as seeking sexual contact. Dr. Suire explained that if someone believes that underage children want to have sex with them, that would be a belief that would enable offending. Dr. Suire described the respondent as in early phase two of treatment out of five, stating he is somebody who has barely begun treatment, hasn't made a lot of progress, is able to stay in treatment, but is not at the point where it would be a protective factor.

¶ 32    Dr. Suire elaborated on how completion of treatment is associated with a reduction in risk to reoffend. He explained that he has recommended people for conditional release or discharge based on partial treatment progress if they have done well enough in treatment. In making this determination, he considered whether they had a good understanding of their risk factors, acknowledged what they had done, acknowledged their risk, and had developed and implemented

11

effective interventions. Dr. Suire did not believe that the respondent understood his risk, and he had not developed any interventions to address his risk. While the respondent had made progress in treatment, he was still in the earliest stages. Dr. Suire further opined that it would be difficult to find any place in the community with an array of sex offender treatment as extensive as that of the current DHS placement.

¶ 33     Dr. Suire ultimately concluded that the respondent was substantially probable to reoffend in the future. He stated that the most important factor for that conclusion was the pervasiveness of the respondent's attraction to children, how strong it was, and how much it was related to both his sexual interest and his emotional and affiliative needs. Dr. Suire stated again that it is the view of the developer of the risk assessment instruments, and the opinion generally held by experts within the field, that the actuarial risk scores are underestimated.

¶ 34     In addition to expert testimony, the State's case included two reports that were admitted into evidence. The first was Dr. Stanislaus's psychiatric evaluation report (Stanislaus Report) of December 7, 2020, which indicated that the respondent's father had never been involved in the respondent's life; his mother and sister had both passed away; the respondent had never been married and was not in a relationship at the time of the interview; and he had no children. The Stanislaus Report stated that the respondent's closest relatives were cousins in Kansas City, Kansas.

¶ 35     The second report was Dr. Suire's SVP commitment psychological examination (Suire Report) of February 8, 2021, which indicated that the respondent received social security disability benefits due to learning problems, a prior diagnosis of schizophrenia, and a back injury. The Suire Report also indicated that the respondent had a history of substance abuse involving alcohol, marijuana, cocaine, methamphetamine, and K2, with cannabis as his substance of choice. The

respondent had received substance abuse treatment on two occasions and Dr. Suire believed it was likely that the respondent had a substance abuse disorder centered on cannabis, but he did not have sufficient information to give the diagnosis. The Suire Report noted that the respondent was recommended for substance abuse treatment in IDOC, but that he did not ever participate in any such treatment.

¶ 36 The Suire Report also indicated that the respondent had a history of at least two psychiatric hospitalizations. There was no documentation that the respondent participated in any ongoing mental health or sex offender treatment in IDOC during either of his two periods of incarceration. The respondent had reported that he had attended a few sessions of sex offender treatment in the community while on parole in 2003.

¶ 37 The Suire Report also set forth a history of the respondent's behavioral incidences while in IDOC. During his incarceration in 2003 and 2004, the respondent had been issued six tickets for behavioral incidences. During his incarceration in 2019, the respondent had been issued three tickets for behavioral incidences, and the most recent one was for threatening his cellmate.

¶ 38 The Suire Report also outlined the treatment available at DHS's Treatment and Detention Facility (TDF). It stated that at the TDF, the DHS sex offender treatment program was comprised of five phases: (1) assessment, where participants were evaluated; (2) accepting responsibility, where participants fully disclose their history of sexual offenses; (3) self-application, where participants develop understanding of their sex offense cycle and identify ways to avoid reoffending; (4) incorporation, where participants use their self-identified interventions and create a plan to avoid reoffending in the community; and (5) transition, where participants modify their plans to prepare for implementation and integration into the community.

¶ 39    Upon completion of the State's case, the respondent called Dr. Elaine Bochenek to testify. Dr. Bochenek is a licensed clinical psychologist. The parties stipulated that she was an expert in the field of sex offender evaluations. Her sources for conducting the evaluation were a video conference interview with the respondent; the Department of Corrections Sexually Violent Persons Commitment Act checklist, a sex-offender pre-release evaluation from December 6, 2019, the respondent's IDOC inmate status, IDOC movement history, IDOC master and medical files, State of Illinois criminal records from Madison and St. Clair counties, and law enforcement records. She had completed approximately 78 SVP evaluations.

¶ 40    Dr. Bochenek did not use any actuarial instruments in her evaluation of the respondent. Dr. Bochenek testified that she did not agree that the respondent had a paraphilic mental condition and did not do a risk assessment of the respondent because she did not find that he had a qualifying mental disorder. She was unsure as to whether she would agree with the other doctors that the respondent is substantially probable to commit another sex offense. She concluded that he was much more likely to commit another type of crime due to his antisocial personality disorder. Dr. Bochenek believed the respondent was not minimizing anything during their interview.

¶ 41    Dr. Bochenek stated that she had asked the respondent about the incident involving the three-year-old. He told her that the child was having trouble using the bathroom and so he placed Vaseline in the child's anus and put him back on the toilet. Dr. Bochenek found this explanation to be plausible. Regarding that case, the respondent told Dr. Bochenek that he should not have pleaded guilty. Regarding the 2016 case, he told Dr. Bochenek that he pleaded guilty because the jury would not have believed him due to the earlier case. Despite this, Dr. Bochenek said the respondent did seem to take responsibility for the crimes.

14

¶ 42    Dr. Bochenek also noted that the parole violation was written up only for cannabis, and while it mentions that the respondent had contact with a child, the actual violation was for the cannabis use. Dr. Bochenek additionally noted that the respondent was able to explain the usefulness of various aspects of treatment, and in 2002, he stated that to avoid future sex crimes he was going to steer clear of all young people.

¶ 43    Dr. Bochenek further stated that in the respondent's early twenties, he was diagnosed with psychotic disorders. Dr. Bochenek found it notable that during the announcement the respondent made in church, the respondent said if *anyone* wanted to have sex with him, they should raise their hand. He did not limit that announcement to children. She stated that the incident could have been caused by a psychotic disorder or break of some kind, and that cannabis use could have contributed to that incident. She believed that the incident could have been a call for help. She agreed that the respondent was formerly on antipsychotic medication, but at this time he was no longer on any such medication and had no psychiatric symptoms.

¶ 44    Dr. Bochenek diagnosed the respondent with antisocial personality disorder and cannabis use disorder. Regarding the antisocial personality disorder, the criteria that Dr. Bochenek determined to apply to the respondent were substantial criminal history, impulsivity, irritability and aggressiveness, reckless disregard for the safety of self or others, lack of remorse, age, and evidence of a conduct disorder before age 15. Criteria that Dr. Bochenek determined did not apply were deceitfulness and consistent irresponsibility. She also diagnosed the respondent with severe cannabis use disorder and opined that his abuse of cannabis interfered with his ability to function.

¶ 45    Dr. Bochenek did not, however, conclude that the respondent was an SVP. She explained that this was because there was not an intense and persistent desire or urge to engage in deviant sexual behavior. In order to meet the criteria for pedophilic disorder, Dr. Bochenek explained that

15

the person must have engaged in fantasies or sexual urges regarding, or engaged in sex with, a prepubescent child over a period of at least six months. She found that the respondent did not meet that criteria.

¶ 46 Dr. Bochenek defined hebephilia as a recurrent urge or need to be involved sexually with someone between 11 and 14 years old. She stated that a 15-year-old victim would not be counted as hebephilia. Dr. Bochenek then agreed that the respondent's motivation for his offenses was antisocial in nature and was opportunistic. She also explained that if a person has a paraphilic disorder and they are using alcohol or drugs to excess, it could impact their paraphilic behaviors because it disinhibits the individual.

¶ 47 On cross examination, Dr. Bochenek explained that with paraphilia, someone may be aroused by having sex with a woman against her will, and that is the motivation. With antisocial personality disorder, if something happens to be available, the person will take advantage of it. The motive is not to hurt someone for the stimulation of hurting them. It is opportunistic. She agreed that anyone suffering from antisocial personality disorder could potentially decide to have sex with a three-year-old. She explained that if an opportunity becomes available, someone with antisocial personality disorder will take what they want regardless of what the person or the law thinks. When asked if the respondent wanted a three-year-old, Dr. Bochenek said she did not know.

¶ 48 When asked if antisocial personality disorder could be a qualifying disorder under the Act that is leading the respondent to commit sex crimes, Dr. Bochenek said no, because it is not a paraphilic disorder. When questioned as to whether the antisocial personality disorder could cause the respondent to commit further sexual offenses, Dr. Bochenek agreed that it was the cause of the respondent's prior sex offenses but stated that the respondent was much more likely to commit other future offenses rather than a sexual offense.

¶ 49    Dr. Bochenek stated that she was aware that the respondent had admitted to other sexual offenses, including with a four-year-old girl, but stated that she did not believe those statements to be credible. She was aware of the respondent's voluntary statement to Belleville police that he had sex with the three-year-old more than once. The respondent told her that he was acknowledging what he was accused of with that statement, not admitting to the conduct, and she believed his explanation.

¶ 50    Dr. Bochenek also stated that she was not aware of the respondent's admission to his disclosure group that he had sex with a 12-year-old boy. After reviewing a report from January 2024 she acknowledged that the respondent made the statement, that he talked about having deviant sexual fantasies around the time of the offense, and that he talked about the grooming behaviors he had used. She did not change her opinion regarding paraphilia because the fantasies were at the time of the offense and did not account for a six-month period of time.

¶ 51    Dr. Bochenek agreed that the respondent also said he felt shame about his interest. She disagreed that this met criteria for pedophilic disorder because the treatment note that included the statement was not clear where the shame was coming from, either the legal consequences he was experiencing or the interest in children. When she was asked whether the context of the statement helped to clarify the source of the shame, where the treatment note said he expressed the feelings of shame in the same paragraph where he discussed his sexual interest in children and his grooming of children, Dr. Bochenek stated that the grooming behaviors were buying gifts for and playing with the children, and so she was not sure if that was grooming or just helping them out.

¶ 52    Dr. Bochenek stated that she did believe that the respondent's crimes had occurred, despite his denying them to her. When asked if that was deceitful, Dr. Bochenek stated that the respondent did admit to being with a 15-year-old, and so he was not deceitful. When asked again about the

17

three-year-old, she expressed an understanding that at first there was doubt as to whether that had occurred when the child initially reported it.

¶ 53    Regarding pedophilic disorder, Dr. Bochenek stated that her issue with the diagnosis was that the respondent did not appear to display the urges over a period of six months. When asked about the years between offenses and the respondent's admission to offenses involving a 5-year-old girl, the 3-year-old two times, a 14-year-old female, and a 14-year-old male, Dr. Bochenek explained that because the respondent went 16 years without having a second offense charged, the urges were not recurrent, intense, and persistent. Dr. Bochenek did not agree that the 12-year-old would fit the criteria for pedophilic disorder because puberty for boys can start at age 11, and so the DSM-5 is antiquated because children are maturing earlier these days.

¶ 54    The respondent also testified at the trial. He explained that he completed phase one of treatment over a two-year period, and that he had been in phase two for about a year. When asked about his disclosure of the five-year-old female victim, the respondent stated that he was embarrassed of his charges and would sometimes fabricate different reasons for being in prison. He stated this was the case with the victim he had identified as a 14-year-old girl. He testified that she did not exist.

¶ 55    The respondent stated that the reason for the incident that occurred in church was that he was feeling guilty about the three-year-old. He explained that during the testimony part of the church service, people would stand up and ask for help with things like rent. He said that when he stood up and asked the question about having sex with him, he was just being obnoxious. He also said that he only told the church deacon about one male who he found attractive at church who was at least 16 years of age.

¶ 56    The respondent also addressed several other topics that had come up during trial. Regarding whether the three-year-old was a relative of his, the respondent explained that he was not related to the child. Regarding the children in his home during the parole violation, the respondent testified that he was living with his mother at the time, and his sister was also living there with her children, but the children were not there for any purpose relating to the respondent. Regarding the nine-year-old, the respondent stated that he was working on his car and the child approached him and asked him to fix the chain on his bicycle. He fixed it and the child left, but when law enforcement came to the home, the child approached and asked what was going on, and the incident was blown out of proportion. The respondent also denied ever telling anyone about a five-year-old. He stated that when he was 15, he was in inpatient treatment for marijuana. He stated that he never had an incident with a five-year-old, and he never told anyone that such an incident occurred.

¶ 57    The respondent stated that at group therapy, the group was asked whether a 16-year-old is still a child. He said no because 16-year-olds get in trouble and can be charged as adults. After group, a therapist questioned him about the answer, and the respondent explained his belief that it should not be up to the State to decide a 16-year-old's consensual age. He testified that this was not for himself because he is too old, but that he expressed the opinion from the point of view of a young person whom he thought would want to make his or her own choices.

¶ 58    The respondent was asked about reports he made in therapy about fantasies he had at the time of the offense involving the 12-year-old. He had reported fantasies involving imagining the victim unclothed; fondling the victim's penis; anally penetrating the victim with his penis; orally penetrating the victim with his penis; and being in a relationship with the victim. He had also reported thoughts about other male and female adolescents between 13 and 17 years old unclothed. The respondent agreed that he had made those statements in therapy but said that the fantasies

19

were not acted upon and were mostly about the 15-year-old. He admitted to initially denying contact with the three-year-old but then stated that he had made an attempt with the child.

¶ 59   Following closing arguments, the trial court found the respondent to be an SVP. The trial court stated that the first element, conviction of a qualifying offense, was clearly proven. The trial court then found that the respondent had qualifying mental disorders including pedophilia and hebephilia. It explained that because the discrepancy in the doctors' opinions related to motivation, the antisocial personality disorder diagnosis did not explain why a grown man would want to have sexual relations with a three-year-old. The trial court found that there would have to be sexual attraction; it stated that there are many other antisocial things that could be done to a three-year-old, but sexual abuse is another level. Further, the trial court stated that the respondent would be much more likely to act on those behaviors because he is also antisocial. It noted that the respondent's risk to reoffend was calculated to be twice the level of other sex offenders and found that the State had proven that the respondent's mental disorder created a substantial probability that he will engage in future acts of sexual violence.

¶ 60   The trial court then stated that it had enough information to proceed to disposition. It stated that at the current stage, the respondent would be a danger to the community if released. It also stated that it had considered the nature and circumstances of the respondent's behavior, his mental history and present mental condition, and what arrangements were available to address his mental condition. The trial court found that the respondent would participate in necessary treatment so long as he continued to reside at the DHS treatment facility where the treatment is intensive. The trial court noted that the respondent was still in the early stages of treatment where he had progressed to stage two out of five stages, and it expressed concern that the respondent is still

20

minimizing his crimes against children and his involvement in those crimes. The trial court then ordered the respondent to be committed to DHS for institutional care in a DHS facility.

¶ 61 The respondent, through trial counsel, filed a notice of appeal on April 17, 2024, and a special defender was appointed to represent the respondent on appeal.

¶ 62                                    II. ANALYSIS

¶ 63 On appeal, the respondent argues that the State presented insufficient evidence that the respondent is an SVP where the evidence was contradictory that the respondent suffered from a mental disorder and was inadequate to show beyond a reasonable doubt that the respondent was substantially likely to reoffend. The respondent also argues that his remand to the custody of DHS was improper given the factors set forth in the Act.

¶ 64                          A. Sufficiency of the Evidence

¶ 65 On appeal, the respondent first argues that the State failed to prove each element required for the trial court to find that the respondent was an SVP. Under the Act, the State must prove beyond a reasonable doubt that the respondent (1) was convicted of a sexually violent offense, (2) has a mental disorder, and (3) the mental disorder makes it substantially probable that he will engage in future acts of sexual violence. 725 ILCS 207/5(f), 35(d) (West 2022); *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. The term "substantially probable" means "much more likely than not." *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 62.

¶ 66 The respondent argues that the State failed to prove beyond a reasonable doubt that he suffered from a mental disorder and that he was substantially probable to engage in future acts of sexual violence. When reviewing the sufficiency of the evidence, a reviewing court asks whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the Act beyond a reasonable doubt. *Fields*, 2014 IL 115542, ¶ 20. It is the

21

trier of fact's responsibility to resolve conflicts in the evidence, determine the credibility of witnesses, and decide what weight is afforded to witness testimony. *Moody*, 2020 IL App (1st) 190565, ¶ 43. Thus, we may not substitute our judgment for that of the trier of fact and will not reverse its decision unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *Id.*

¶ 67    In the present case, the respondent does not, nor could he, dispute the State's proof of the first element, *i.e.*, that he was convicted of at least one sexually violent offense. Rather, the respondent contends that the State failed to prove that he has a mental disorder and that this disorder makes it substantially more likely that he will engage in acts of sexual violence. We will address each of the respondent's contentions in turn.

¶ 68                                        1. Mental Disorder

¶ 69    The respondent first argues that the State did not prove beyond a reasonable doubt that he has a mental disorder as defined by the Act. Referring to the discrepancies in diagnosis between Dr. Stanislaus, Dr. Suire, and Dr. Bochenek, the respondent argues that the differences in opinion between the three experts indicate reasonable doubt as to whether the State proved the respondent's diagnosis beyond a reasonable doubt. We disagree.

¶ 70    The Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2022). In determining whether the State has met its burden, reviewing courts have routinely relied on expert testimony, and deferred to the factfinder's determinations regarding an expert's credibility. *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36; *Fields*, 2014 IL 115542, ¶ 27; *In re Detention of White*, 2016 IL App (1st) 151187, ¶¶ 58-62.

22

¶ 71 In the present case, the evidence was sufficient to find that the respondent had a mental disorder as defined by the Act. Dr. Stanislaus diagnosed the respondent with pedophilic disorder, hebephilia, and antisocial personality disorder. Dr. David Suire diagnosed the respondent with pedophilic disorder and unspecified personality disorder. Both doctors testified that they diagnosed the respondent with pedophilic disorder because he had sexually molested a three-year-old boy whom he was sexually attracted to and had emotional involvement with, had disclosed that he was attracted to young children in treatment, and had sexually molested a 12-year-old boy in 2016.

¶ 72 Dr. Stanislaus additionally diagnosed the respondent with hebephilia because he reported a sexual interest in developing boys, told church officials he was in a relationship with a 14-year-old boy in 2002, and molested a 15-year-old boy in 2016. When asked about Dr. Stanislaus's diagnosis of hebephilia, Dr. Suire stated that he thought it was a reasonable diagnosis. He explained that he did not give it because he believed the respondent's primary interest is in children 13 years old and younger, but it is fair to say that the respondent met the criteria for diagnosis of hebephilia as well.

¶ 73 Dr. Stanislaus also diagnosed the respondent with antisocial personality disorder due to his multiple repeated arrests and legal issues. Dr. Suire diagnosed the respondent with unspecified personality disorder. Dr. Suire opined that the respondent likely met criteria for antisocial personality disorder, however, he did not make that diagnosis because the respondent refused an in-person interview. Dr. Suire did testify, however, that the respondent's history of difficult relationships, including very conflicted, violent, unhealthy relationships with adults, indicates that his personality disorder will make it difficult for him to form healthy relationships with adults, and this will make it more likely that he will seek out contact with children.

¶ 74    Dr. Bochenek diagnosed the respondent with antisocial personality disorder and severe cannabis use disorder, neither of which, in her opinion, were qualifying offenses pursuant to the Act. Dr. Bochenek did not believe that pedophilic disorder was an appropriate diagnosis because the respondent went 16 years without having a second offense charged, and so that meant he did not experience recurrent, intense, persistent urges over a period of six months. She did not agree that the 12-year-old the respondent molested would fit the criteria of pedophilic disorder because puberty for boys can start at age 11, and so she believed the criteria used by the DSM-5 is antiquated. Dr. Bochenek also disagreed with the other experts' opinions that the respondent has hebephilia, as hebephilia requires a recurrent urge to be involved sexually with someone between 11 and 14-years-old. She did not address why she did not diagnose hebephilia with regard to the respondent's 12-year-old victim and his self-reported 14-year-old victim, except to express doubt as to the veracity of the respondent's self-reporting.

¶ 75    Dr. Bochenek ultimately did not believe that deviant sexual urges motivated the respondent's conduct. When asked if antisocial personality disorder could be a qualifying disorder under the Act that is leading the respondent to commit sex crimes, Dr. Bochenek said no, because it was not a paraphilic disorder. When questioned as to whether the antisocial personality disorder could cause the respondent to commit further sexual offenses, Dr. Bochenek agreed that it was the cause of his prior sex offenses but stated that he was much more likely to commit other offenses in the future rather than a sexual offense.

¶ 76    Dr. Stanislaus disagreed with Dr. Bochenek. She testified that the respondent's propensity to commit sex offenses comes from his pedophilic disorder. She explained that while the antisocial disorder motivates the respondent to get what he wants when he wants, the pedophilic disorder drives his desire to seek being with children and molesting them.

24

¶ 77    Dr. Suire also disagreed with Dr. Bochenek that the respondent did not suffer from a paraphilic disorder. He stated that there is no reason that a person with a criminal way of thinking, as in antisocial personality disorder, would have an interest in prepubescent children. He explained that when antisocial personality disorder coexists with a paraphilic disorder like pedophilia, the antisocial personality disorder will make the person more likely to act on the urges, but antisocial personality disorder alone would not lead to an attraction to a three-year-old. Such an attraction would be its own disorder.

¶ 78    The trial court had evidence that two experts diagnosed the respondent with a qualifying mental disorder, pedophilic disorder, and it had testimony from both experts as to the nature of the disorder and how the respondent fit the criteria. The trial court also explained that it found Dr. Bochenek's diagnosis unsatisfactory to explain why the respondent had sexual desire for a three-year-old. Taking the evidence in the light most favorable to the State, we find that there was sufficient evidence presented by the State for a rational factfinder to find beyond a reasonable doubt that the respondent suffers from a congenital or acquired condition affecting the emotional or volitional capacity that predisposes him to engage in acts of sexual violence. The respondent's argument to the contrary amounts to a request to reweigh the experts' testimony and credibility, a task we, as the reviewing court, simply cannot undertake.

¶ 79                    2. Substantial Risk to Reoffend

¶ 80    The respondent next argues that the State did not prove beyond a reasonable doubt that the respondent was substantially probable to reoffend. He argues that the only evidence offered to prove his risk of reoffending were the actuarial scores, and that those assessments were based on past conduct. He argues that no evidence of current behaviors was provided that would make it much more likely that he would reoffend.

25

¶ 81    The third element of an SVP the State was required to prove, beyond a reasonable doubt, was that the respondent's current mental disorder created a substantial probability that he would engage in acts of sexual violence in the future. 725 ILCS 207/5(f), 35(d) (West 2022); *In re Detention of Samuelson*, 189 Ill. 2d 548, 559 (2000). Substantially probable means "much more likely than not." *Gavin*, 2019 IL App (1st) 180881, ¶ 43.

¶ 82    The respondent's argument that his actuarial scores, based on past conduct, were the only evidence offered to prove substantial probability to engage in future sexual violence and were insufficient without evidence of current behaviors, fails for two reasons. First, the argument implies that to meet the third element of an SVP, evidence of current behaviors must be presented. The respondent cites no authority to support this position. While a respondent cannot be involuntarily committed based solely on past conduct (*Samuelson*, 189 Ill. 2d at 559), the State is not required to provide evidence of current behaviors to meet the third element of an SVP. See 725 ILCS 207/5(f), 35(d) (West 2022). The plain language of the statute makes no reference to current behaviors. The State is required to present evidence of a substantial probability created by a current mental disorder. *Id.*

¶ 83    Second, neither of the State's experts relied solely on actuarial scores to determine that the respondent's paraphilic disorders created a substantial probability of future sexual violence. Both experts provided the respondent's diagnosis of paraphilic disorders, explained the lifelong nature of those disorders, discussed how risk is increased due to dynamic factors, set forth dynamic factors as they applied to the respondent, and indicated that no protective factors applied to reduce the respondent's risk to reoffend. Both of the State's experts concluded that the respondent was substantially probable to reoffend in the future, and in doing so, Dr. Suire emphasized the

26

pervasiveness of the respondent's attraction to children and how it was related to both his sexual interest and his emotional and affiliative needs.

¶ 84    Dr. Bochenek did not complete a risk assessment because she did not find that a qualifying mental disorder existed. She was unsure as to whether she would agree with the other experts' opinions that the respondent is substantially probable to reoffend.

¶ 85    The standard of substantially probable to reoffend "cannot be reduced to a mere mathematical formula or statistical analysis." *In re Detention of Hayes*, 321 Ill. App. 3d 178, 188 (2001). Ultimately, the trial court found the State's experts' comprehensive risk assessments more compelling than Dr. Bochenek's denial of the mental conditions that contribute to that risk, and determined the respondent was substantially probable to reoffend. We defer to the trier of fact on expert credibility and will not reweigh conflicting expert testimony. *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 67. Viewing the evidence in the light most favorable to the State, we find that there was sufficient evidence presented by the State for a reasonable trier of fact to find beyond a reasonable doubt that the respondent's mental disorder made it substantially probable that he would commit future acts of sexual violence.

¶ 86    While each case is fact specific, this case is well in line with a multitude of cases finding sufficient evidence that a respondent was an SVP. See, *e.g.*, *In re Commitment of Floyd*, 2025 IL App (1st) 230047-U, ¶ 121 (collecting cases). We do not find that the evidence was so improbable or unsatisfactory that it leaves a reasonable doubt and accordingly, the respondent is not entitled to reversal on this issue.

¶ 87                                    B. Commitment to DHS

¶ 88    The respondent next argues that the trial court's order remanding him to the care, custody, and control of DHS was improper. The respondent states that when the trial court determined

27

whether he should be committed for institutional care or conditionally released, it failed to consider the statutory factors. Specifically, the respondent argues that the trial court failed to consider the respondent's mental health history, present condition, and the testimony and findings of Dr. Bochenek, and instead focused on the testimony of Dr. Suire. The respondent also argues that the trial court failed to consider the arrangements available in the community which could have given the respondent proper treatment.

¶ 89    Under section 40(a) of the Act (725 ILCS 207/40(a) (West 2022)), once an individual is found to be an SVP, the trial court "shall order the person to be committed to the custody of [DHS]." *Id.* In its order, the trial court must specify whether the individual is to be committed to institutional care in a secure facility or conditionally released. *Id.* § 40(b)(2); *In re Commitment of Dudley*, 2025 IL App (4th) 230462-U, ¶ 71. In determining whether commitment should be for institutional care in a secure facility or for conditional release, the court shall consider (1) the nature and circumstances of the behavior that was the basis of the allegation in the petition under paragraph (b)(1) of section 15 of the Act (725 ILCS 207/15(b)(1) (West 2022)); (2) the person's mental history and present mental condition; and (3) what arrangements are available to ensure that the person has access to and will participate in necessary treatment. *Id.* § 40(b)(2). We review the trial court's decision for an abuse of discretion. *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 52. An abuse of discretion is only found where the decision is arbitrary, fanciful, or unreasonable. *Id.*

¶ 90    In this case, after finding the respondent was an SVP, the trial court proceeded to disposition. The trial court stated that it had considered the nature and circumstances of the respondent's behavior, his mental history and present mental condition, and what arrangements

28

were available to address the respondent's mental condition. The trial court then ordered the respondent to be committed to the custody of DHS for institutional care.

¶ 91    The respondent's first argument is essentially that, regarding the nature and circumstances of the respondent's behavior and his mental history and present mental condition, the trial court failed to consider those factors because it did not credit the respondent's expert witness over the State's expert witnesses. The record indicates that both Drs. Stanislaus and Suire discussed the respondent's criminal behavior, his mental health history, and his current mental health condition. Dr. Bochenek and the respondent both testified as to the respondent's criminal behavior. Dr. Bochenek also testified regarding the respondent's mental health history and current mental health condition. As noted above, the trial court indicated that it considered all of these factors in making its determination. Again, it is the trier of fact's responsibility to resolve conflicts in the evidence, determine the credibility of witnesses, and decide what weight is afforded to witness testimony. *Moody*, 2020 IL App (1st) 190565, ¶ 43. The trial court stated that it had considered each of the relevant factors, and it had ample evidence before it relating to each factor. A credibility determination from the trial court does not amount to a failure to consider the statutory factors, and we do not find that the trial court failed to consider the statutory factors here.

¶ 92    Next, the respondent argues that the trial court failed to take into account what arrangements were available in the community to ensure that he had access to and would participate in necessary treatment. We again disagree.

¶ 93    In rendering its decision, the trial court specifically stated that the respondent would be a danger to the community if released. The trial court found that the respondent would participate in necessary treatment *so long as* he continued to reside at the DHS treatment facility where the

29

treatment is intensive. The trial court also noted that the respondent was only in phase two of treatment and expressed concern that the respondent was still minimizing his crimes.

¶ 94    While the trial court did not specifically elaborate on the arrangements available in the community, it is not required to do so. The trier of fact in a bench trial is not required to mention anything that contributed to its verdict. If the record contains facts that support the trial court's finding, the reviewing court may consider those facts to affirm the finding, even if the trial court did not state specifically that it relied on them. See *In re Commitment of Kordelewski*, 2018 IL App (2d) 170623-U, ¶ 34; see also *In re Commitment of Schauer*, 2017 IL App (2d) 170266-U, ¶ 31.

¶ 95    In this case, the trial court had evidence before it that the respondent was substantially probable to reoffend, and it found that he posed a danger to the community. The trial court also had evidence before it that the respondent had difficulty following rules, had not progressed to the planning phase of treatment, and had not voluntarily engaged in treatment to a meaningful degree during either his two periods of incarceration or his subsequent release after his first period of incarceration. The trial court had further evidence before it that the respondent does not have a support system in Illinois to assist or support the respondent with treatment in the community. Each of these facts is relevant to the trial court's consideration of what arrangements were available in the community to ensure that the respondent had access to and would participate in necessary treatment. The trial court stated that it had considered what arrangements were available, and the record contained sufficient evidence for the trial court to make that determination.

¶ 96    Although the respondent claims that the trial court failed to consider all three statutory factors, the record shows that the trial court was presented with and considered all of the evidence and its relationship to the factors listed in section 40(b). On review, we will not reweigh the

30

relevant factors or substitute our judgment for that of the trial court. *In re Commitment of Haskins*, 2016 IL App (3d) 150767-U, ¶ 16. While the respondent argues that absent an opportunity to be treated in the community, he cannot ever prove he is not a threat, a trial court does not abuse its discretion by committing a person to a secure facility where the person's mental disorders make it substantially probable that he or she will commit future acts of sexual violence. *Id.* ¶ 15. The trial court heard and considered evidence regarding the nature and circumstances of the behavior that was the basis of the State's petition to have the respondent adjudicated an SVP. The trial court heard extensive testimony about the respondent's mental condition, past and present, and his high risk of reoffending. The trial court also heard evidence regarding whether the respondent could access treatment in the community and whether it was likely that he would participate in treatment in the community. The trial court stated unequivocally that it considered all of the factors. The plain language of the statute required no more. See *In re Commitment of Schauer*, 2017 IL App (2d) 170266-U, ¶ 31.

¶ 97    We cannot find that the trial court ignored any of the section 40(b)(2) factors. Evidence was presented as to each factor, and the trial court stated it had considered each of those factors in its determination to commit the respondent to DHS. There is no indication in the record that the trial court's determination was arbitrary, fanciful, or unreasonable. Accordingly, we affirm the trial court's order of commitment.

¶ 98                                 III. CONCLUSION

¶ 99    For the foregoing reasons, we affirm the trial court's judgment finding the respondent was an SVP and ordering commitment to DHS.

¶ 100   Affirmed.

31